UNITED STATES, Appellant/Cross–Appellee,

v.

Oluwakayode A. BAMIDURO, Appellee/Cross–Appellant.

Nos. 98–CO–124, 98–CF–259.

District of Columbia Court of Appeals.

Argued Sept. 1, 1998.

Decided Sept. 17, 1998.

Chrisellen R. Kolb, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher and Margaret A. Carroll, Assistant United States Attorneys, were on the brief, for appellant/cross-appellee.

Kenneth D. Auerbach, Silver Spring, MD, for appellee/cross-appellant.

Before SCHWELB and FARRELL, Associate Judges, and KING, Associate Judge, Retired.

FARRELL, Associate Judge:

The United States appeals from a partial grant of a motion for judgment of acquittal following guilty verdicts. *See* D.C.Super.Ct.Crim.R. 29(c) (1998). Although defendant Bamiduro's identification as the person who shot at Lieutenant Shannon was vulnerable to attack before the jury, we are unable to conclude—as the trial judge did—that no rational juror could have found beyond a reasonable doubt that Bamiduro was the assailant. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Shannon's identification of Bamiduro was itself legally sufficient, and drew substantial corroborative support from the events surrounding the shooting. We therefore reverse the partial grant of the MJOA and remand with directions to reinstate the vacated convictions.

## I.

### A.

A July 1997 indictment charged Bamiduro with assault with a dangerous weapon (ADW) on David Ejeh, D.C.Code § 22–502 (1996); ADW on Olajide Soremekum; possession of a firearm during a crime of violence (PFCOV) arising from the assault on Soremekum, D.C.Code § 22–3204(b); ADW on Lieutenant Toby Shannon; PFCOV arising from the assault on Shannon; and carrying a pistol without a license, D.C.Code § 22–3204(a).

Following a jury trial, Bamiduro was found guilty of all counts except PFCOV as to Soremekum. Bamiduro moved for a judgment of acquittal as to the remaining counts and for a new trial under Super.Ct.Crim.R. 33, alleging a violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[1] The trial judge denied the Rule 33 motion and denied the MJOA as to the Ejeh and Soremekum counts, but set aside all of the verdicts related to Shannon on grounds of insufficient evidence.

### B.

Viewed in the light most favorable to the verdicts, *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781, the evidence presented at trial showed the following. In late February or early March 1997, Bamiduro and Ejeh, both students at Howard University, had an argument over the use of Ejeh's racquet during a practice session for the university table tennis team. Soremekum, also a Howard student and a teammate of Ejeh, intervened to prevent a fight. Bamiduro and Ejeh had no further direct communication until May 11, 1997.

Shortly after 9:00 on that evening, Soremekum was on his way to meet Ejeh at Howard to fill out an application for a summer job. He encountered Bamiduro near the school and told him where he was going, then continued on alone to the chemistry building. Since the building was locked, he telephoned Ejeh, who came out to meet him. Bamiduro appeared again and the three men entered the building together. As Ejeh was opening the inner foyer door, he "heard a bang on [his] head," blood started "gushing out" of it,

---

[1] The alleged *Brady* violation was the government's failure to disclose before trial the "various conflicting descriptions of the shooter" that would be given by its witnesses at trial. The trial judge correctly ruled that none of these had been "suppressed" within the meaning of *Brady;* quite the contrary, the discrepancies were the subject of substantial adversarial questioning at trial. *See, e.g., United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (*Brady* rule "involves the discovery, after trial, of information which had been known to the prosecution but unknown to the defense").

and he screamed. He covered his head with his hand but was struck again on the arm with a metal object. Soremekum exclaimed, "Olu [Bamiduro], why are you doing this?" and grabbed Bamiduro, who was starting to leave, but released him when Bamiduro put a "silver object that looked like a gun" against Soremekum's stomach. Ejeh chased Bamiduro out of the building and toward the engineering building; Soremekum ran behind yelling to him to stop because Bamiduro had a gun. Soremekum later described Bamiduro as wearing a leather jacket and a "face cap, like a baseball cap." Ejeh identified him as wearing a jacket and "face cap" that were "kind of dark brown."

Ejeh saw Bamiduro stop at a parked car between College Avenue and Sixth Street, open the driver's side door and lean into the car, then close the door and continue running. Howard University campus police officer Lesesne was patrolling the area and, looking north on Sixth Street near College Avenue, saw two black males running after a third.[2] No one else was in the area, and Lesesne assumed that the runners came from the chemistry or engineering building. He saw the pursued male stop at the driver's side of a gray Toyota Tercel, the only car parked on Sixth Street, then flee again; the two pursuers broke off the chase. The Tercel was later found to contain a traffic ticket bearing Bamiduro's name.

As Lesesne ran after the lone male, he radioed to Howard University police Lieutenant Shannon, "You have a black male coming your way" who might have been "trying to break into a car."[3] The fleeing male turned east on Bryant Street where Shannon saw him and radioed, "I picked him up. I've got him right here and I'm chasing him." Shannon had seen a man with dark pants and a

dark baseball cap running east on Bryant Street; no one else was on foot in the vicinity.[4] In his campus police car, Shannon pursued the runner across a parking lot and tried to cut him off. Through the open passenger side window he saw the runner's face and saw him pull out a handgun. Shannon drew his weapon and found cover at the rear of the car. Ten seconds later he heard a gun shot. The shooter then ran off through an alley and Shannon radioed the campus police and the Metropolitan police. The gunshot had penetrated the windshield and dashboard of his car.

Shannon was the only witness to the actual shooting. A few days later he was shown photographs of possible suspects, including Bamiduro, but could not identify the assailant. On May 30, nineteen days after the shooting, he was called to a student-discipline hearing between the dean of the university and Bamiduro. When Bamiduro arrived at the hearing, Shannon "immediately recognized him" from his "facial features," particularly his nose and "thick lips," as the man he had chased; he was "a hundred percent sure" Bamiduro was the fleeing person.[5] At trial, Shannon stated that he had seen the man's face and most of his upper body for "a few seconds" through the open passenger-side window of the police car; both were turned toward him. He described the assailant as 5'6" or 5'7" tall and wearing a jacket whose color he could not recall.[6] Officer Lesesne's incident report, made after interviewing Ejeh and Soremekum on May 11, gave Bamiduro's height as 5'6."

Ejeh and Soremekum identified Bamiduro from photographs and at trial as their assailant.

---

2. Lesesne testified that this took place at about 9:00 p.m., and that the subsequent shooting he heard was at "approximately 9:20" p.m.

3. Lesesne did not get a good look at the fleeing man's face, but later described him as wearing dark trousers and a light-colored, possibly light brown, jacket or windbreaker. Another Howard police officer, Ronald Chambers, had also radioed a lookout heard by Shannon for a male wearing dark pants and a hat.

4. According to Shannon, this occurred "shortly after 9 p.m."

5. Before attending the administrative hearing, Shannon already assumed that the assailant at the chemistry building was the same person who had shot at him.

6. The same evening as the shooting, Shannon had described the assailant to MPD Officer Jolly as wearing black pants, a black hat, and a tan and white parka.

## II.

It has long been established in this jurisdiction that

if a reasonable mind might fairly have a reasonable doubt or might fairly not have one, the case is for the jury, and the decision is for the jurors to make.... Both innocence and guilt beyond reasonable doubt may lie fairly within the limits of reasonable conclusion from given facts. The judge's function is exhausted when he determines that the evidence does or does not permit the conclusion of guilt beyond reasonable doubt within the fair operation of a reasonable mind.

*Curley v. United States,* 81 U.S.App.D.C. 389, 392, 160 F.2d 229, 232 (1947); *see Jackson,* 443 U.S. at 318 n. 11, 99 S.Ct. 2781 (citing *Curley* as setting forth "the prevailing criterion for judging motions for acquittal in federal criminal trials"). That standard applies "whether the motion for judgment of acquittal was made at trial ... or after a verdict has been returned by a jury." *United States v. Hubbard,* 429 A.2d 1334, 1338 (D.C.1981). This court reviews the sufficiency of the evidence *de novo,* applying the same standard as the trial court. *Id.*

In this case, Bamiduro makes no challenge to his convictions for assaulting Ejeh and Soremekum. Although he noted a cross-appeal, he has filed no brief and made no argument disputing the sufficiency of the evidence that he assaulted his fellow students minutes before, and in the same neighborhood as, the shooting at Lieutenant Shannon.[7] Further, Bamiduro filed no motion to suppress Lieutenant Shannon's out of court or in court identifications on due process grounds. Hence, although he invokes due process language in his brief by arguing that Shannon's identification entailed "a very substantial likelihood of irreparable misidentification," *see Neil v. Biggers,* 409 U.S. 188, 197, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), he is remitted to the argument that the identification, *together* with the surrounding circum-

stances, was so weak in evidentiary import that "no reasonable juror acting reasonably[ ] could convict on the evidence presented." *Beatty v. United States,* 544 A.2d 699, 701 (D.C.1988).

Even if this case presented "the special context where ... the finding of guilt rests solely upon the positive identification testimony of a single witness," *Crawley v. United States,* 320 A.2d 309, 311, *reh'g en banc denied,* 325 A.2d 608 (D.C.1974), we would still be obliged to reverse the grant of the MJOA. The *Curley* test quoted above "applies specifically to identification evidence, as it does to any other kind of evidence." *In re R.H.M.,* 630 A.2d 705, 707 (D.C.1993). As the trial judge herself recognized, "cases in which reversals are required because the identification evidence was insufficient are 'very rare.'" *Gethers v. United States,* 684 A.2d 1266, 1275 (D.C.1996) (quoting *R.H.M.,* 630 A.2d at 706 & n. 1). This is not one of them. The trial judge was troubled by the suggestivity of the "second sighting" in which Lieutenant Shannon recognized Bamiduro at the discipline hearing, saying at one point: "[S]o he fails to pick him in a photo array,[8] then comes to Howard University for that ... hearing and he comes to see the person who[m] he has now, for a variety of reasons, ... concluded is the same person that fired the shot at him, so he is presumed to identify the person as his shooter." However, Shannon's explanations for not making a photographic identification, as well as *for* recognizing Bamiduro (with "one hundred percent" certainty) at the discipline hearing, were both for the jury to evaluate. *See, e.g., Sterling v. United States,* 691 A.2d 126, 131–32 (D.C.1997). The nineteen-day lag between the crime and sighting was fairly short. *See, e.g., Cureton v. United States,* 386 A.2d 278, 286 (D.C.1978) (twelve day lag relatively short time that "strengthens the accuracy of the identification"); *Jackson v. United States,* 354 A.2d 869, 872 (D.C.1976) (three week lag; same). Moreover, Shannon testi-

---

7. In accordance with the suggestion of Bamiduro's counsel at oral argument, we dismiss the cross-appeal.

8. The judge was unimpressed by Shannon's testimony that the photographs "looked distorted," having viewed them herself and found "nothing unclear" about them. Moreover, Bamiduro's name appeared on his photograph.

fied and identified Bamiduro at trial,[9] recalling the facial features from which he had recognized him and describing the opportunity he had had to observe him on May 11. This is not a case such as *Crawley* and *Beatty, supra,* therefore, where the witness failed to identify the defendant at trial or disavowed a previous identification, or both. *See Gethers,* 684 A.2d at 1275. "[E]vidence with some element of untrustworthiness," the Supreme Court has said, "is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Manson v. Brathwaite,* 432 U.S. 98, 116, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). That sums up accurately Shannon's identification and the reason why the trial court should have left it to the jury.[10]

Furthermore, even if we doubted the sufficiency of the identification standing alone, in fact it was part of a larger context of events that lent it very substantial corroborative force. The testimony of Ejeh and Soremekum, and especially that of Officer Lesesne, enabled the jury to trace a direct evidentiary line from the (now conceded) assaults by Bamiduro on his fellow students to the assault on Shannon. Confirming the testimony of Ejeh and Soremekum, Lesesne saw Bamiduro being chased by the two, then stop briefly at the driver's door of a Toyota Tercel in which a traffic ticket bearing his name was found.[11] As Bamiduro turned east on Bryant Street, Lesesne lost sight of him but learned immediately that Shannon had "picked him up" running in that direction and was chasing him.[12] No other pedestrians were on Bryant Street. Shannon saw Bamiduro wearing a dark baseball cap, which confirmed Soremekum's partial description of him as wearing a "face cap, like a baseball cap" and Ejeh's similar reference to a dark brown face cap.

The trial judge was nonetheless troubled by the differing descriptions of the man alleged to have assaulted Shannon, particularly as to his jacket type and color. Certainly there were discrepancies, as indeed one might expect among identifications made or recorded by as many as seven witnesses— four who each witnessed portions of the events and three Metropolitan police officers who later took down their descriptions. But a look at the following chart of testimony is enough to explain why, in our view, the discrepancies were too slight to mistrust the jury's ability to resolve them:

| Witness | Jacket | Description Other Clothing | Physical |
|---------|--------|---------------------------|----------|
| Soremekum | leather | "face cap" | shorter than 5'6" or 5'7" |
| Ejeh | dark brown | dark brown face cap | |
| Shannon | possibly black and white but "not sure" | dark pants, dark cap | 5'6"–5'7" |

9. The trial judge was mistaken in her recollection that the prosecutor had not "attempt[ed] to [e]licit an in-court identification by Lieutenant Shannon at the trial itself."

10. Bamiduro notes that the prosecutor conceded in oral argument before the trial court that if Shannon's identification "was all the [g]overnment had, we wouldn't have a case." That concession is of no legal significance, however, for the reason that the trial judge—while noting that it was "commendable"—placed no reliance on it, instead setting forth on the record her reasons for concluding that the identification was insufficient as a matter of law.

11. Indeed, the trial judge acknowledged that "[u]ndisputed is the fact that this car is Mr. Bamiduro's car," at least in the sense that he exercised dominion and control over it at the time.

12. Shannon also testified that this occurred shortly after 9:00 p.m.

| Witness | Jacket | Description Other Clothing | Physical |
|---|---|---|---|
| Lesesne | light colored jacket or windbreaker | dark pants, unsure if wearing hat | |
| MPD Officer Jolly (radio broadcast based on information from Shannon) | tan and white parka | black pants, black hat | |
| MPD Officer Jefferson (broadcast based on information from Jolly, Shannon or Lesesne) | | | 5'7", 150–160 lbs. |
| MPD Detective Stevens | brown leather | black jeans brown boots | 5'6" 150–160–200 lbs. |

These discrepancies in clothing description are not even remotely as stark as those that troubled us in *Crawley, supra.* We conclude that they "affect[ed] only the weight of the evidence, not its sufficiency," and should have been "left for the jury to evaluate in the exercise of its sound discretion." *Hill v. United States,* 541 A.2d 1285, 1287 (D.C. 1988).[13]

The trial judge exercised her responsibility under Rule 29 conscientiously and in the manner implicitly preferred by the rule, *i.e.,* after the jury had spoken and she had time to reflect upon the evidence. The test for setting aside the jury's verdict is nonetheless a rigorous one, and it was not met here. On an earlier occasion when Bamiduro's counsel challenged the sufficiency of the evidence, the trial judge had stated:

So if I were to credit your narrative of what happened, I have got an incident in a Chemistry Building with Mr. Bamiduro and Mr. Ejeh and Mr. Soremekum, and then by incredible coincidence, but minutes later, I have somebody opening the door of Mr. Bamiduro's car, taking off running, being observed by Officer Lesesne, ... being commented on by Lesesne to Shannon, ... being chased by Lieutenant Shannon, ultimately firing a shot through Lieutenant Shannon's windshield.... [A]ll within minutes of the assault in the Chemistry Building and that person couldn't possibly be [*i.e.,* could not reasonably be found by a jury to be], according to your scenario, Mr. Bamiduro.

The judge's initial disposition to reject this "scenario" was well founded. The MJOA should not have been granted.

### III.

In a footnote to his brief, Bamiduro asks in the alternative that the case be remanded for the trial court to "revisit[ ] appellee's Rule 33 motion to [grant] a new trial in the 'interests of justice' as the verdict was against the weight of the evidence. *See Tibbs v. Florida,* 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982)."[14] Bamiduro, howev-

13. The trial judge was dismayed by the investigation conducted by MPD Detective Stevens and by her comportment on the witness stand. Although that displeasure is justified by the record, it simply is not the case here that poor police work "tangled and confused the evidence *irremediably*" (emphasis added), as the judge believed. Stevens was not a witness to the crimes (she was called as a witness by the defense, not the government), and the defects in her investigation and testimony—all of which the jury heard—do not come close to nullifying the combined weight of the identification and circumstantial evidence.

14. *Tibbs* noted that "some federal courts have interpreted Rule 33 ..., which authorizes a new trial 'if required in the interest of justice,' to permit the trial judge to set aside a conviction that is against the weight of the evidence." 457 U.S. at 38 n. 12, 102 S.Ct. 2211. In this situation the trial judge sits, so to speak, "as a 'thirteenth juror.'" *Id.* at 42, 102 S.Ct. 2211.

er, never moved for a new trial on this (*i.e.*, the *Tibbs* or "thirteenth juror") ground; his motion was based solely on an asserted violation of *Brady v. Maryland.* See note 1, *supra.* The trial court, therefore, would have lacked authority to grant the motion on the ground now asserted, *United States v. Braman,* 327 A.2d 530, 535 (D.C.1974), hence could not do so on a "remand"—even putting aside the time limits of Rule 33 and Bamiduro's waiver of the ground by failure to raise it previously.

### IV.

In No. 98–CO–124, the judgment of the Superior Court is reversed and the case is remanded for entry of judgment on the vacated counts. We dismiss the appeal in No. 98–CF–259.

*So ordered.*