Ronald W. ROBINSON, Appellant,

v.

UNITED STATES, Appellee.

Ricky Bailey, Jr., Appellant,

v.

United States, Appellee.

Nos. 00–CO–262, 98–CO–499, 95–CF–1809, 95–CF–1815.

District of Columbia Court of Appeals.

Argued Sept. 26, 2000.

Decided May 2, 2002.

---

Jonathan E. Rubens, appointed by the court, for appellant Robinson.

Peter L. Goldman, appointed by the court, for appellant Bailey.

Barbara J. Valliere, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher, Roy W. McLeese, III, and Albert A. Herring, Assistant United States Attorneys, were on the brief, Washington, DC, for appellee.

Before TERRY, FARRELL, and REID, Associate Judges.

TERRY, Associate Judge:

Appellants Robinson and Bailey were convicted of one count each of first-degree murder while armed, possession of a firearm during a crime of violence, and carrying a pistol without a license. On appeal, both appellants contend that the evidence as to all counts was legally insufficient to convict them, that the court erred in admitting the opinion testimony of an investigating detective, and that the court erred in denying their respective motions under D.C.Code § 23–110 (2001) based on claims of ineffective assistance of counsel. Bailey also maintains that the government violated his rights under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to make timely disclosure of a witness' name and grand jury testimony. We reject all of these arguments and affirm both appellants' convictions, as well as the orders denying both § 23–110 motions.

## I

### A. *The Government's Evidence*

Janet Blakeney testified that on December 17, 1993, her nineteen-year-old son Frank and his close friend, eighteen-year-old James Harris, were repairing Frank Blakeney's car, which was parked at the curb in front of the Blakeney home. At one point Harris went inside to watch television while Frank Blakeney remained outside working on the car. A short time later, a friend, Quindell Mercer, called and spoke with Harris briefly,[1] whereupon Harris "slammed the phone down" and ran out the front door.

From inside the house, Mrs. Blakeney heard gunfire and heard her son cry out for her. She quickly called the police and then ran outside, where she found her son lying on the ground, with Harris close beside him. She also saw "a grey car ... parked extremely close to Frank's car with the windows down ... on the wrong side of the street" and facing in the wrong direction. Mrs. Blakeney did not see anyone in the car because she "wasn't that close ... and they were like leaning back in the car...." When she knelt down beside her son, he made a "death growl." Leaning forward, Mrs. Blakeney put her ear next to his chest and heard his heart slowly stop beating. Frank Blakeney was taken to the hospital and pronounced dead shortly after arrival.

James Harris testified that when he received the telephone call from Mercer, he became "concerned" as a result of what Mercer told him. He ran outside to the front yard, and from about midway between the sidewalk and the house he called out to Frank Blakeney, but Blakeney was busy working on his car and did not respond. Harris briefly headed back toward the house, but then turned again toward Blakeney. As he did so, he saw a blue car[2] with its headlights off pull up next to Blakeney and stop. Some of the occupants of the car began to shoot at Blakeney. Harris stated that at first he "froze up," and that he "was in shock and then fell to the ground after calling [Blakeney's] name." He heard Blakeney cry out for his mother, then heard someone in the car yell, "Bail out." The car quickly sped away in the "wrong direction" (*i.e.*, against traffic).

Frank Blakeney and his car were between Harris and the shooters. The shots were fired from the driver's side of the shooters' car, which was the side nearest to Harris. Harris testified that he saw at least four persons in the car and that he recognized two of them as appellants Robinson and Bailey, whom he knew as "Ron" and "Little Rick." They were both firing at Blakeney from inside the car.[3] Bailey was on the passenger side of the car, and Robinson was in the back seat. Harris also said that at least two other individuals, including Telly Wilson,[4] were in the car. According to Harris, the firing of the guns lit up the inside of the car so that he could

---

1. The court sustained defense counsel's hearsay objection to any testimony about the contents of the telephone conversation.

2. This was inconsistent with the testimony of Mrs. Blakeney, who said that the car was grey. Harris, however, had previously told the police that the shots had come from "a grey smaller car."

3. Harris testified that he had known both Robinson and Bailey for three to five years prior to the shooting. He said that he saw Robinson frequently and that he used to ride his bicycle around the neighborhood with both Robinson and Bailey.

4. Wilson, whom Harris had known for about four years, was shot and killed sometime before appellants' trial.

see appellants' faces.[5] Harris was unable to state how far he was from the shooters at the time, but the investigating officer estimated from what Harris told him that the distance was approximately forty to fifty feet.

The police soon arrived and attempted to speak with Harris, but he was not cooperative and gave them a false name. Harris admitted this when he testified at trial, but he said he was "upset and mad" and was "thinking about getting revenge." He was also concerned about the likelihood that Mrs. Blakeney or others, including himself, might get hurt.

Harris was then taken to the police station, where Detective Daniel Whalen questioned him. Harris initially told Whalen that he had "heard gunshots and had seen a car leaving the area...." Whalen testified that Harris was "very nervous, very upset, and intentionally vague as to what he knew about the shooting," and that he could extract information from Harris only "with difficulty." The prosecutor then asked Whalen:

Q. Did he ever tell you at that time that he had actually seen the shooting?

A. No.

Q. Did he tell you that he didn't see the shooting?

A. Yes, he did.

Q. Did you believe him when he told you that?

MR. McCARTHY [counsel for Robinson]: Objection, Your Honor.

MR. ENGLE [counsel for Bailey]: Objection, Your Honor.

MR. HERRING [the prosecutor]: It goes to the detective's state of mind relating to why he subsequently did what he did.

THE COURT: The objection is overruled.

Q. Did you believe him when he told you that he had not seen the shooting?

A. No.

Q. Why not?

A. Based on other information I had that he was outside at the time the shooting happened. He told me he was inside, in essence giving him an excuse as to why he could not have seen what happened, and his demeanor.

Finally, Detective Whalen said that his efforts to contact Harris after the night of the shooting were unsuccessful because Harris had given him a "fictitious last name and address."

In 1994 Harris pleaded guilty to attempted robbery in Montgomery County, Maryland, and was incarcerated there. Whalen eventually learned of this and, on August 8, 1994, went to the Montgomery County Jail to question Harris again.[6] Harris was reluctant to talk at first and did not reveal who shot Blakeney until Detective Whalen mentioned a letter that Harris had written to Blakeney's mother from jail.[7] Harris then admitted that, in the letter, he had indicated that Robinson and Bailey were the shooters.[8] Whalen

---

5. Harris described the gun flashes in the following manner: "It look like it wasn't gonna stop, it ain't stop. It didn't want to stop like somebody light, lighting a cigarette lighting, and you get to see. If you hold the cigarette light, it won't go out till you blow it out. That's what I seen like what it was."

6. This second interview with Harris took place after Harris had been sentenced in the Maryland case. Harris testified that no police officers spoke with him about Blakeney's

shooting between his arrest in Montgomery County and his guilty plea, nor was any plea agreement made in return for Harris' testimony against Robinson and Bailey.

7. It was apparently from this letter that Detective Whalen found out Harris' true identity.

8. This letter is in the record on appeal, but its contents were never disclosed to the jury. In the letter Harris did not mention Robinson or Bailey by name, but he said that members of

then showed him an array of photographs, and Harris, with tears in his eyes and "shaking a little bit," selected a photograph of Robinson and identified him as "one of the ones shooting." He admitted that he had withheld this information earlier because he was afraid that he or his family might get hurt. Harris also named Bailey as a shooter, even though his picture was not in the array. Whalen later returned with another group of photographs, and from that group Harris picked out a photo of Bailey and confirmed that he was also one of the shooters.[9]

Defense counsel cross-examined Detective Whalen about how he came to interview Harris the second time. Using the detective's nine pages of interview notes from the night of the shooting, counsel sought to establish that Whalen's description of Harris on the night of the shooting as "uncooperative" was inaccurate and misleading. On redirect, the prosecutor asked Whalen whether he believed Harris when he said he was inside the house at the time he heard gunshots. When both defense attorneys objected, the court overruled the objections, stating:

> The thrust of the cross-examination, at least with respect to [Robinson's counsel], is the detective's characterization that [Harris] was not cooperative, despite the fact that there were a lot of notes. There is a suggestion that that is inconsistent with not being cooperative. So I'm supposed to ask the question [*sic*] why didn't he think he was cooper-

ative despite the fact that he gave him a lot of information.

Asked to explain why he did not initially believe Harris, the detective repeated that he had "interviewed [another] person who had heard the gunshots outside . . . [and] immediately looked out the window and saw . . . [Harris] outside at the time the shooting happened."

The shooting occurred sometime between 6:30 and 7:00 p.m. on December 17, and the sun had already set. Mrs. Blakeney testified that street lights "two car lengths" ahead and "three car lengths" behind Frank Blakeney's car were fully lit, as was the light on the Blakeneys' porch. Mrs. Blakeney also stated that she had clamped a light to the hood of her son's car before the shooting[10] so that the engine, on which he was working, would be illuminated. Officer Stephen McDonald, the first officer to arrive at the scene, testified that there were two street lights near Blakeney's car, that the light attached to the car's hood was on, that the porch light was on, and that the lighting was good enough for someone "to see people and faces." Officer Michelle Tate stated, however, that the diagram she made of the scene indicated that the street light in front of Frank Blakeney's car was off when she arrived some time later.

Robert Poole, an expert on firearms and ammunition, testified that at least three and possibly four guns were involved in the shooting and that a flash is produced when a bullet is fired. No additional expert testimony concerning the light pro-

---

the "37th Street Crew" were involved in the shooting as a possible retaliation for gang activity. Although Robinson and Bailey may have been members of this "crew," neither the government nor the defense made any attempt to bring out this fact, apparently for tactical reasons. Bailey filed a post-trial motion claiming that his counsel was ineffective for failing to do so. That claim was rejected

by the court, and Bailey does not challenge that ruling on appeal.

9. Harris also identified both appellants in court as the gunmen.

10. This light was connected by a series of extension cords to an electrical outlet in the living room of the Blakeney house.

duced from a gun flash was presented by the government or by either defendant. Fourteen shell casings were recovered from the scene, indicating that at least fourteen shots had been fired. Some forensic evidence also indicated that the shooters' car was moving as the shots were fired.

No murder weapon was recovered, and no evidence other than the identification made by James Harris was presented to connect either appellant with the shooting.

### B. *The Defense Evidence*

The defense presented evidence that Telly Wilson was detained in a locked ward at Saint Elizabeths Hospital at the time of Blakeney's murder. The defense theory was that, since Harris said Wilson was in the car during the shooting, Harris' identification of the occupants of the car, including Robinson and Bailey, was not credible. Antoinette Hughes, the supervisor of medical records at Saint Elizabeths, testified that Wilson was admitted to the hospital on November 11, 1993, and was discharged on January 7, 1994. She also said that Wilson escaped from the locked ward on December 7 and returned on December 8 (nine days before the shooting), but there was no other record of an escape or unauthorized absence. The hospital records also reflected that Wilson was in the ward at 11:10 a.m. on the day of the shooting, but his whereabouts after that time were not recorded.

### II

■ Appellants contend that the evidence was insufficient to convict them because the only evidence connecting them to the murder, Harris' identification, was not reliable. We review claims of insufficiency of the evidence *de novo*, applying the same standard as the trial court. *See United States v. Bamiduro*, 718 A.2d 547, 550

(D.C.1998). We will reverse a conviction because of insufficient evidence "only ... if we conclude, as a matter of law, that no reasonable juror, acting reasonably, could convict on the evidence presented." *Beatty v. United States*, 544 A.2d 699, 701 (D.C.1988) (citation omitted). Although the circumstances surrounding Harris' identification of appellants did raise some questions, we hold that the evidence was nonetheless sufficient to permit a jury to find both appellants guilty as charged.

■ It is well settled that "the identification testimony of a single eyewitness is sufficient to sustain a conviction." *In re R.H.M.*, 630 A.2d 705, 708 (D.C.1993) (citations omitted); *accord, e.g., Peterson v. United States*, 657 A.2d 756, 760 (D.C. 1995). Appellate decisions holding that "evidence identifying the defendant as the person who committed the crime was insufficient to support a conviction" are "very rare." *In re R.H.M*, 630 A.2d at 706. Cases decided by this court in which eyewitness identification evidence has been deemed insufficient have generally been limited to circumstances "where the witness failed to identify the defendant at trial or disavowed a previous identification, or both." *Bamiduro*, 718 A.2d at 551; *see Gethers v. United States*, 684 A.2d 1266, 1275 (1996) (discussing three such cases), *cert. denied*, 520 U.S. 1180, 117 S.Ct. 1458, 137 L.Ed.2d 562 (1997). This is not such a case. Harris identified each appellant's photograph from separate arrays shown to him by Detective Whalen, and he testified that he was sure that Robinson and Bailey were the gunmen when he again identified them in court.

■ "In evaluating eyewitness identification testimony, we look to such factors as the ability of the witness to make a meaningful identification—the witness' opportunity to observe and the length of time of the observations, the lighting conditions,

the length of time between the observations and the identification, the stimuli operating on the witness at the time of the observation, as well as the degree of certainty expressed by the witness in making the identification." *Beatty,* 544 A.2d at 701 (citation omitted). Applying these standards, we cannot say that Harris was unable to make a legally sufficient identification of these appellants.

■ Harris said that during the commission of the crime, he saw both appellants firing at Frank Blakeney from inside a car. Appellants contend that Harris could not have accurately identified them in a moving car from a distance of forty to fifty feet, with only the stroboscopic light of the muzzle flashes to illuminate their faces. We hold that a jury could reasonably determine that such an identification was possible.[11] *Cf. Coleman v. Alabama,* 399 U.S. 1, 3–6, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) (plurality opinion) (upholding the admission of testimony by a witness who had a fleeting but "real good look" at his assailant in the headlights of a passing car). We note in particular that, according to Harris' testimony, the car was not in fact moving, but had stopped before the shooting began.[12] In addition, the fact that Harris knew these two appellants is especially significant. We recognize that "eyewitness identification by strangers may often be fraught with peril," *United States v. Hunter,* 692 A.2d 1370, 1377 (D.C.1997), but Harris testified that he had known both appellants for several years prior to the shooting. Given this testimony, a jury could reasonably find that Harris was able to recognize Robinson and Bailey, even if he might not have been able to recognize two strangers in the same situation.

■ In addition, although there were factors that could have had a negative effect on Harris' credibility,[13] the jury had an opportunity to assess all of these factors and nevertheless could reasonably conclude that Harris' testimony was credible. Harris' initial refusal to identify appellants as the shooters was adequately explained, and that explanation was within the province of the jury to believe or disbelieve. *See Nelson v. United States,* 601 A.2d 582, 593 (D.C.1991). The fact that Harris may have misidentified Telly Wilson as one of the individuals in the shooters' car does not make his identification of these appellants as the shooters incredible as a matter of law. Even if it were not a reasonable inference that Telly Wilson escaped from Saint Elizabeths on the night of the shooting without detection, the jury could reasonably conclude that Harris' possible misidentification of Wilson was ir-

11. Furthermore, although the sun had set at the time of the shooting, other evidence established that several lights were on in the immediate area, and Officer McDonald testified that the lighting was "good enough to see people and faces."

12. A crime scene search officer concluded that the car was moving when the shots were fired. We are obliged, however, to view the evidence in the light most favorable to the government, *see, e.g., Lawson v. United States,* 596 A.2d 504, 509 (D.C.1991) (citing cases), which in this instance means that we must accept Harris' testimony and disregard that of the officer.

13. These factors included the length of time between the shooting and the photographic identification (almost eight months); the fact that Harris was incarcerated at the time of the identification, which could raise a question about his motivation for cooperating with the police; Harris' differing statements to police at the time of the shooting and in the later interview in the Montgomery County Jail; and the fact that Harris also identified Telly Wilson as one of the occupants of the car, even though other evidence showed that Wilson was probably in Saint Elizabeths Hospital on the evening of the shooting.

relevant to his identification of Robinson and Bailey, both of whom he had known for several years.

Viewing all the evidence in the light most favorable to the government, as we must, and "keeping in mind the jury's right to assess credibility and to draw reasonable inferences from the evidence it has heard," *Nelson,* 601 A.2d at 593 (citation omitted), we cannot say that the evidence was insufficient to support either appellant's conviction. Although a different jury might have decided the case differently, it is not for this court to reject the verdict of the jury that actually heard the evidence.

### III

■ Appellants argue that the trial court impermissibly permitted Detective Whalen to state his opinion about the truthfulness of Harris' initial statements on the night of the shooting. We review a trial court's decision to allow opinion testimony under an abuse of discretion standard. *See, e.g., Otis Elevator Co. v. Tuerr,* 616 A.2d 1254, 1256 (D.C.1992). Assuming for the sake of argument that the challenged testimony was indeed an expression of opinion, we hold that the trial court did not abuse its discretion in allowing the jury to hear it.

■ First, we have often recognized that a fact witness may express an opinion so long as it is based on the witness' personal observation of events and is "helpful" to the jury in fulfilling its role as fact-finder. *See, e.g., Bedney v. United States,* 684 A.2d 759, 767 (D.C.1996); *Carter v. United States,* 614 A.2d 913, 919 (D.C.1992); *Fateh v. Rich,* 481 A.2d 464,

470 (D.C.1984). Whalen's "opinion" testimony was based on his personal observations of Harris' demeanor and on the fact that he had received contradictory information from another witness that Harris was outside, not inside, when the shooting occurred. The trial judge could, and did, reasonably conclude that Whalen's testimony would be helpful to the jury because it explained why he questioned Harris a second time for information about Frank Blakeney's murder. *See Bedney,* 684 A.2d at 767 ("Whether a witness' lay opinion is helpful to the jury is a decision left to the sound discretion of the trial court").

■ Second, although we have repeatedly held that "[i]t is improper for the prosecutor to ask one witness to comment on the credibility of prior witnesses," *McLeod v. United States,* 568 A.2d 1094, 1097 (D.C.1990), Detective Whalen was not asked to offer, and never offered, any opinion as to whether Harris was credible *as a witness.* Rather, the prosecutor asked him whether, on the night of the incident, he believed Harris when Harris denied seeing the shooting at all. As the trial judge correctly discerned, Whalen's view of Harris' disavowal on the night of the shooting was offered for the limited purpose of explaining the detective's decision to continue to seek out and eventually reinterview Harris.[14] Because Whalen said nothing about Harris' credibility as a witness *at trial,* there was no error in the admission of the challenged testimony for the limited purpose of proving Whalen's reasons for interviewing Harris a second time.

### IV

■ Both appellants filed § 23–110 motions claiming ineffective assistance of

---

14. Neither defense counsel requested a limiting instruction about why the "opinion" testimony was admitted. Absent such a request, the trial court did not commit reversible error in failing to give such an instruction. *See Gilliam v. United States,* 707 A.2d 784, 785 (D.C.1998) (en banc).

counsel. Under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a convicted defendant seeking to set aside a conviction on the ground of ineffective assistance must make a two-part showing: first, that counsel's performance was deficient, and second, "that the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. 2052. The trial judge denied both motions without a hearing.[15] We agree with the trial judge that both motions failed to meet the *Strickland* test, and that appellants were therefore not entitled to relief or even to a hearing.

■■■ Appellant Bailey asserted that his trial counsel was ineffective for failing to call an expert witness to refute Harris' claim that he could identify appellants' faces in the flash of gunfire. But Bailey never submitted any affidavit, or even an unsworn statement, summarizing the expected testimony of such an expert. In the absence of any proffer of expert testimony about the difficulty of identifying the shooters by the light of the gunfire, the trial judge could properly conclude that the claim that counsel was ineffective for not calling such an expert was "vague and conclusory" and, therefore, that Bailey was not entitled to a hearing. *See Forrester v. United States*, 707 A.2d 63, 65 (D.C.1998); *Fields v. United States*, 698 A.2d 485, 489 (D.C.1997), *cert. denied*, 523 U.S. 1012, 118 S.Ct. 1203, 140 L.Ed.2d 331 (1998); *Sykes v. United States*, 585 A.2d 1335, 1339–1340 (D.C.1991).

■■■ Appellant Robinson maintained that his counsel was ineffective because he failed to state the reasons for his objection to Detective Whalen's "opinion" testimony, thereby foreclosing an exercise of discretion by the trial judge that might have favored Robinson. However, he cites no case in which the failure to state a reason—or to state all reasons—for an objection amounts to an unreasonable deficiency in counsel's performance *per se*. Indeed, there is authority to the contrary. *See, e.g., Lawrence v. United States*, 603 A.2d 854, 859 (D.C.1992) (defense counsel's decision not to object to untimely presentation of chemist's report was not ineffective; even if counsel had objected, trial court would not have been obliged to exclude report); *United States v. Harley*, 301 U.S.App. D.C. 70, 73 n. 4, 990 F.2d 1340, 1343 n. 4 (counsel was not ineffective for failing to object on proper ground to arguably too-detailed hypothetical question posed to government's expert, and it was doubtful that counsel's objection based on a different ground was deficient), *cert. denied*, 510 U.S. 885, 114 S.Ct. 236, 126 L.Ed.2d 190 (1993); *Collier v. United States*, 92 F.Supp.2d 99, 105–106 (N.D.N.Y.2000) (counsel was not ineffective for failing to object to testimony on ground that it violated defendant's Sixth Amendment rights, given counsel's objection to testimony on another ground and court's allowance of testimony for limited purpose).

Furthermore, as the trial judge stated in his order. denying Robinson's § 23–110 motion:

While it is true that defense counsel did not immediately state the grounds for the first objection, the prosecutor articulated why the question was proper, and the court overruled the objection. There can be no doubt that the prosecu-

---

**15.** Although there is a presumption in favor of holding a hearing on a § 23–110 motion alleging ineffective assistance of counsel, "a hearing is unnecessary when the motion consists of (1) vague and conclusory allegations, (2) palpably incredible claims, or (3) allegations that would merit no relief even if true." *Ready v. United States*, 620 A.2d 233, 234 (D.C.1993) (citation omitted).

tor and the court understood the objection. . . .

Since it is clear that the judge understood the reasoning behind counsel's objection, we hold that Robinson has failed to demonstrate a reasonable probability, as required by *Strickland* and many other cases, that but for counsel's supposedly deficient performance the outcome of the trial would have been different. *See, e.g., Kinard v. United States,* 635 A.2d 1297, 1307 (D.C.1993).

We therefore find no error in the denial of either appellant's § 23–110 motion.

V

 Under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194. Moreover, "the prosecution must disclose exculpatory material 'at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case. . . .'" *Edelen v. United States,* 627 A.2d 968, 970 (D.C.1993) (citation omitted); *accord, e.g., Boone v. United States,* 769 A.2d 811, 819 (D.C.2001). Appellant Bailey contends that the trial court erred in concluding that the government's disclosure of Harris' identity and its production of the transcript of his grand jury testimony complied with these requirements.

On September 15, 1995, a week before the scheduled trial date, Bailey filed a motion to compel disclosure of the name and address of the sole eyewitness (Harris). On September 19 the court orally denied the motion because there was "no suppression under *Brady.*" The trial did not actually begin until September 27.

 It is not entirely clear from the record just when defense counsel first learned Harris' identity, but the record does show that counsel received a copy of Harris' grand jury testimony on the first morning of trial, shortly before the prosecutor's opening statement. Counsel thus had sufficient opportunity to make effective use of that grand jury testimony in his cross-examination of Harris, had he chosen to do so. But Bailey has never explained how pre-trial knowledge of Harris' name and address could have led to the discovery of any exculpatory evidence, nor has he shown that earlier disclosure of Harris' identity would have been reasonably likely to produce a different outcome. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs,* 427 U.S. 97, 109–110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

 Furthermore, "[a]bsent a statutory or constitutional requirement, the government need not disclose a list of its witnesses in trials of non-capital offenses." *Davis v. United States,* 315 A.2d 157, 161 (D.C.1974); *see Rambert v. United States,* 602 A.2d 1117, 1120 (D.C.1992); *Smith v. United States,* 392 A.2d 990, 993 n. 3 (D.C. 1978). Bailey claims nevertheless that "in a sole eyewitness case, the defense must be given the opportunity to contact and interview that witness as part of its preparation for trial" because the witness' testimony is "pivotal." This is not, however, a *Brady* claim, and Bailey's claim below was limited to a *Brady* request; he did not seek the witness' name and address under any other theory. *See, e.g., United States v. White,* 325 U.S.App. D.C. 282, 297, 116 F.3d 903, 918 (defendant was not entitled to witnesses' names when he offered no

particularized reason favoring disclosure, and security concern for witnesses militated against disclosure), *cert. denied,* 522 U.S. 960, 118 S.Ct. 390, 391, 139 L.Ed.2d 305, 306 (1997).

 During his grand jury testimony, Harris spoke of his desire for revenge against both appellants. When Bailey's counsel received a transcript of the grand jury testimony on the first morning of trial, he asserted that Harris' remarks about his desire for revenge were exculpatory and requested a continuance to "rework" his opening statement. The trial judge denied the request, stating that he did not "view [Harris' remarks] as exculpatory information" and that counsel could question Harris "with respect to any motivation he may have." We see no abuse of discretion in this ruling.[16]

Even if Harris' stated desire for revenge is construed as subject to disclosure under *Brady,* defense counsel knew about it in time to cross-examine Harris and, in fact, used it to attack Harris' credibility at trial. "[W]here the defendant receives potentially exculpatory information in time to use it effectively at trial, his conviction will be sustained." *Edelen,* 627 A.2d at 971 (citation omitted); *see also Agurs,* 427 U.S. at 108, 96 S.Ct. 2392 ("unless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose"). Moreover, the decision of Bailey's counsel not to pursue the matter further on cross-examination can be viewed as a rational tactical choice. *See, e.g., United States v. Iverson,* 208 U.S.App. D.C. 364, 365, 648 F.2d 737, 738 (1981) ("no violation of due process results from prosecutorial non-disclosure if defense counsel both knows of the information and is able to make use of it but still chooses, for tactical reasons, not to do so").

For these reasons, we find no merit in Bailey's *Brady* argument.[17]

## VI

The convictions of both appellants and the denials of their motions under D.C.Code § 23–110 are all

*Affirmed.*

---

16. Unless the denial of a request for continuance is "so arbitrary as to deny due process," it is reviewable only for abuse of discretion. *O'Connor v. United States,* 399 A.2d 21, 28 (D.C.1979); *see Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964).

17. Robinson also made a *Brady* claim below, but the trial court rejected it, and he has not renewed it on appeal. We deem it abandoned.