**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

IN RE GRAND JURY SUBPOENA                )        Misc. No. 11-527 (RCL)
NO. 11116275                             )
                                         )

## MEMORANDUM AND ORDER

Before the Court is a Motion to Intervene and to Quash [1] filed by the individual who utilizes the Twitter.com username [redacted] and the pseudonym [redacted] (hereinafter "Mr. X").[1] Mr. X seeks to quash a subpoena issued against Twitter by a federal grand jury in the District of Columbia for records pertaining to his identity. Upon consideration of the motion, the government's opposition, and the individual's reply, the Court will grant the motion to intervene and deny the motion to quash.

## I.      BACKGROUND

This matter arises out of Mr. X's professed desire to engage in sadomasochistic activities with Congresswoman and presidential candidate Michele Bachmann. Mr. X posts to http://www.twitter.com/, a social networking Web site that restricts users to messages of 140 or fewer characters. The grand jury issued its subpoena to Twitter, Inc. on August 5, 2011, demanding that Twitter provide "any and all records pertaining to the identity of user name [redacted]." Mr. X posted the message, or "tweet," that provoked the subpoena and is the subject

---

[1] [redacted] likely refers to [redacted]. In the novel, [redacted] an African American standing trial for the alleged rape of a white woman in a segregated town in the South. [redacted] *see* [redacted] (1981). Meanwhile, [redacted] likely refers to [redacted], a brutal [redacted] revolutionary and murderer [redacted]. *See, e.g*, [redacted] A.M.), [redacted]. The Court chooses to refer to the anonymous movant as "[redacted]."

1

of this motion on August 2, 2011, at 9:32 p.m; it no longer appears on the user's Twitter page. The tweet read: "I want to fuck Michelle Bachman in the ass with a Vietnam era machete."[2]

Unfortunately, an overview of Mr. X's Twitter page is warranted. Mr. X's body of tweets is extremely crude and in almost incomprehensibly poor taste. Occasionally political but consistently vacuous, his *oeuvre* represents an infantile attempt at humor that brings to mind the most obscene aspects of Andrew Dice Clay,[3] but without even the infinitesimal modicum of artistic creativity that Mr. Clay managed to possess. The page is entirely without merit, comedic or otherwise. More offensive even than Mr. X's chosen vocabulary is the pathetic transparency and vapidity of his attempt to elicit the attention on the Internet that he surely lacks in real life. Somehow, this attempt has succeeded to the tune of, at the time of the issuance of this Order, 736 followers—a number that will certainly and regrettably grow once this Order is released to the public. A sad state of affairs indeed. But further criticism is unwarranted.[4] Readers are free, though ill-advised, to form their own opinions regarding Mr. X's output on their own time. It suffices here to include a mere sampling of some representative tweets, which are replicated without modification:

---

[2] The government represents that the tweet at issue read, "I want to fuck Michelle Bachmann in her ass with a Vietnam era Machete." Because the tweet no longer appears on Mr. X's page, the Court cannot verify the correct formulation. At any rate, the differences are immaterial.

[3] *See, e.g.*, Janet Maslin, *Review/Film; Andrew Dice Clay Essence: Misogyny, Insult and Sex*, N.Y. Times, May 18, 1991, *available at* http://www.nytimes.com/1991/05/18/movies/review-film-andrew-dice-clay-essence-misogyny-insult-and-sex.html.

[4] And irrelevant to the forthcoming First Amendment inquiry. It goes without saying that the First Amendment applies to even the most tasteless of speech, *see, e.g., Hustler v. Falwell*, 485 U.S. 46, 48 (1988) (involving a political parody wherein *Hustler* magazine portrayed Rev. Jerry Falwell as admitting he lost his virginity "during a drunken incestuous rendezvous with his mother in an outhouse"); *see also New York Times v. Sullivan*, 376 U.S. 254, 270 (1964). Even still, readers deserve an honest assessment of Mr. X's Twitter page without having to debase themselves by viewing it personally.

2

Godamn I smacked my wife with my Dick ... Now she has a cock shaped bruise on her face... Take that take that take that

Marcus Bachmann is sponsoring a scavenger hunt in his home-town In the hopes someone finds his Heterosexuality .

Why does Jesus only communicate With Republicunts and Crazy people? #redundant[5]

My dick testified in court today in the case against my left hand "He beat me,your honor every day for 25 years"

Some of us take great pride in being anti-establishment god loathing socialist degenerate douche Nuggets with Psychopathic Tendencies

Upon receiving the subpoena, Twitter informed Mr. X of its existence and of Twitter's intent to comply unless Mr. X filed a prompt motion to quash. This motion followed.

## II.  DISCUSSION

Mr. X seeks to quash the subpoena directed at Twitter pursuant to Fed. R. Crim. P. 17(c), which permits a court to quash a subpoena *duces tecum* if "compliance would be unreasonable or oppressive."[6] The public, acting through the grand jury, "has a right to every man's evidence." *United States v. Nixon*, 418 U.S. 683, 709 (1974) (quotations omitted). Although this right

---

[5] Users of Twitter commonly place hashtags, signified by a number sign (#), in front of words to signify the topic, genre or style of the tweet; users can then search for or sort tweets by hashtag.

[6] The government does not oppose Mr. X's motion to intervene, and intervention is plainly appropriate where Mr. X's First Amendment rights are at issue. *See, e.g., United States v. Hubbard*, 650 F.2d 293, 311 n.67 (D.C. Cir. 1980); *In re Grand Jury Proceedings*, 201 F. Supp. 2d 5, 9 (D.D.C. 1999).

The Court notes, however, the oddity of permitting a wholly anonymous movant to invoke the power of the federal judiciary. Normally, participation in litigation requires an individual to identify himself, and anonymity is a "rare dispensation." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1464 (D.C. Cir. 1995) (quotations omitted). When considering a request for anonymity, "the court has a judicial duty to inquire into the circumstances of the particular cases to determine whether the dispensation is warranted." *Id.* (quotations omitted). Anonymity is most troublesome in the context of an anonymous plaintiff suing a defendant, which raises due process concerns. *Id.* at 1463. However, in this case, Mr. X's identity is unknown to the government or the grand jury, and it is that very anonymity that is the subject of the dispute. Especially since the government has conceded to Mr. X's intervention, the Court is satisfied that it should allow Mr. X to remain anonymous.

provides the grand jury with the concomitant power to subpoena witnesses, this power is not absolute. In particular, a grand jury may not compel testimony from an individual who holds a valid "constitutional, common-law, or statutory privilege," *id.*, because compliance in such a scenario would be "unreasonable or oppressive" for the purposes of Rule 17(c). *See, e.g., In re Grand Jury, John Doe No. G.J. 2005-2*, 478 F.3d 581, 585 (4th Cir. 2007). Mr. X has a right under the First Amendment to post on the Internet, and to do so anonymously. *See McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 357 (1995) ("Anonymity is a shield from the tyranny of the majority."); *Reno v. ACLU*, 521 U.S. 844, 870 (applying the First Amendment fully to the Internet); *see also Sinclair v. TubeSockTedD*, 569 F. Supp. 2d 128, 131 (D.D.C. 2009). Accordingly, the grand jury may not subpoena Twitter to gain information regarding Mr. X's identity unless the government can show "a compelling interest in the sought-after material" and "a sufficient nexus between the subject matter of the investigation and the information they seek." *In re Grand Jury Investigation of Possible Violation of 18 U.S.C. § 1461*, 706 F. Supp. 2d 11, 18 (D.D.C. 2009).[7]

In practice, the "compelling interest" and "sufficient nexus" requirements involve a straightforward inquiry into whether the information sought is truly necessary to the grand jury's investigation. *See, e.g., In re Grand Jury Subpoena Duces Tecum*, 78 F.3d 1307, 1312-13 (8th Cir. 1996); *In re Grand Jury Proceeding*, 842 F.2d 1229, 1236 (11th Cir. 1988) ("A good-faith criminal investigation . . . is a compelling interest"); *but cf., e.g., In re Grand Jury Subpoena,*

---

[7] The government represents that it may be investigating the tweet as a violation of 18 U.S.C. § 875(c), which criminalizes the transmission "in interstate or foreign commerce" of "any communication containing any threat to kidnap any person or any threat to injure the person of another . . . ." The subpoena at issue identified a possible violation of 18 U.S.C. § 115, which criminalizes threats to "assault . . . a United States official . . . with intent to impede, intimidate, or interfere with such official . . . or with intent to retaliate against such official . . . ." The First Amendment analysis is the same for either statute.

4

246 F.R.D. 570 (W.D. Wisc. 2007) (noting that the court was satisfied that "the government has a bona fide investigative need" to interview individuals who bought books from a target company, but requiring grand jury to solicit volunteers for interviews). That approach has the benefit of easy application in many cases. Here, however, Mr. X argues that the government lacks a real investigative need for his identity. The First Amendment limits the authority of the federal government to criminalize speech, and in this context would only allow prosecution of Mr. X if his tweet constituted a "true threat." In order for a threat to be "true," its speaker must mean "to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual . . . ." *Virginia v. Black*, 538 U.S. 343, 359 (2003). Mr. X argues that this is a purely objective test: Would a reasonable person view the statement as expressing a serious intent to cause harm? Since reasonable people viewing Mr. X's tweets do not know his identity, he posits that the grand jury need not know his identity to determine whether there exists probable cause to indict.

There are many problems with this line of reasoning. First, although many circuits apply an objective test to determine whether a statement is a "true threat," *see, e.g., United States v. Armel*, 585 F.3d 182, 185 (4th Cir. 2009), the D.C. Circuit has not ruled on the issue.[8] Further, a close reading of *Black* raises doubts about an objectivity requirement. There, the Supreme Court held that the First Amendment permits criminalization of the act of burning a cross with intent to intimidate. The Court noted that, "while a burning cross does not inevitably convey a message of intimidation, often the cross burner intends that the recipients of the message fear for their lives." *Black*, 538 U.S. at 357. Regardless of whether any individual act of cross-burning was

---

[8] And indeed does not seem to have addressed the "true threat" doctrine since *Alexander v. United States*, 418 F.2d 1203 (D.C. Cir. 1969).

5

objectively intimidating, the First Amendment permitted criminalization of the act when done with intent to intimidate. If that is the case, it seems odd that in other "true threat" cases the First Amendment would require *proof* of the threat's objective effect. More to the point, the Court spoke more generally of a true threat as the manifestation of a speaker's "intent of placing the victim in fear of bodily harm or death." *Id.* at 360. Again, the focus was not on the objective effect of the threat, but on the speaker's state of mind. This Court therefore doubts the propriety of grafting an additional requirement of objective effectiveness on the crime of uttering a statement subjectively intended to cause fear. *Cf. United States v. Bagdasarian*, 652 F.3d 1113, 1117 (9th Cir. 2011) ("[W]ith respect to some threat statutes, we require that the purported threat meet an objective standard *in addition* [to a subjective standard], and for some we do not." (emphasis in original)); *id.* n.14.

Although an objectivity requirement may seem prudent in some cases, an objective inquiry is uniquely problematic for anonymous threats—particularly those made on the Internet. *Cf. id.* at 1120 n.20 (discussing how anonymity of threat can make threat appear more or less salient). The anonymity of a threatening communication introduces an element of ambiguity that renders an assessment of the threat's legitimacy difficult. A reasonable recipient of such a threat simply may not know whether she ought to take it seriously. Although the recipient of a threat may always have some doubt about the likelihood of the threatened act materializing—such as when the recipient is ignorant of basic details regarding the identified speaker—the recipient of a truly anonymous threat will rarely be able to assess its validity.

Even if objectivity were relevant to Mr. X's guilt, the grand jury would still need to investigate both the objective effect of the supposed threat, *and* Mr. X's subjective intent to

6

threaten at the time of posting, as the government would need to prove both.[9]  Accordingly, the grand jury would still be entitled to make an independent inquiry into Mr. X's subjective intent. And the Court can easily see how information about Mr. X's identity could be relevant to a grand jury—indeed, such information might prove dispositive of the probable cause question.  The grand jury ought to know if Mr. X has a history of making threats to political candidates in other forums, or has stalked or engaged in other sinister behavior toward Ms. Bachmann, or happens to actually own a Vietnam-era machete.  The government and the grand jury surely must know the identity of an individual making a threat in order to ascertain whether he intended the threat to be "true."  The government has thus satisfied the "compelling interest" and "sufficient nexus" requirements.

It bears note that the Court has grave doubts about the likelihood of a grand jury returning an indictment in this case.  A "true threat" requires a "serious expression of an intent to commit an act of unlawful violence."  *Black*, 538 U.S. at 359.  There appears to be nothing serious whatsoever about Mr. X's Twitter page, except perhaps the severity of mental depravity that would lead a person to produce such posts.  Furthermore, in *Watts v. United States*, the Supreme Court considered a Vietnam War protestor's statement that, if drafted and given a rifle, "the first man I want to get in my sights is L. B. J." 349 U.S. 705, 706.  The Court determined that such "political hyperbole" did not constitute a "true threat." *Id.* at 708.  *A fortiori*, it seems, were Mr. X to bring a motion to quash an indictment based merely on the facts now before the Court, the Court might well have occasion to grant that motion.

---

[9] Mr. X argues that an intent to do physical harm is not a necessary component of a threat's status as "true." *See Black*, 538 U.S. at 359 (noting that the "speaker need not actually intend to carry out the threat").  This is correct; the intent at issue is the intent to provoke fear, *i.e.*, to have the statement interpreted as a threat.

But this is not a motion to quash an indictment. It is a motion to quash a subpoena, and the government has the right to make its case to the grand jury that Mr. X has committed a crime. In *Bagdasarian*, the Ninth Circuit determined that the defendant's anonymous message board posts—"Re: Obama fk the niggar, he will have a 50 cal in the head soon," and "shoot the nig country fkd for another 4 years+, what nig has done ANYTHING right???? Long term???? Never in history, except sambos"—did not constitute "true threats." 652 F.3d at 1124. Despite that rather striking conclusion, the Court nonetheless noted that "[a]ll threats against the President or a major presidential candidate must be taken seriously until it is established that there is no reason to do so." *Id.* at 1121 n.20. This Court could not agree more. The government must take seriously all threats against a major presidential candidate such as Ms. Bachmann, unless and until it is satisfied that there is no likelihood that the threat was legitimate. Part of taking a threat seriously may include attempting to convince a grand jury to return an indictment. And if a grand jury does return an indictment, it then becomes the role of the courts to decide the sufficiency of the indictment, *see., e.g., United States v. Alkhabaz*, 104 F.3d 1492 (6th Cir. 1997) (affirming district court quashing of indictment involving threat), or the jury to determine whether the threat is "true," *see, e.g., United States v. Malik*, 16 F.3d 45, 49 (2d Cir. 1994) ("Whether a given writing constitutes a threat is an issue of fact for the trial jury."), or an appellate court to reverse a conviction, *see, e.g., Watts*, 349 U.S. at 708, among other potential dispositions. But it is for the Executive, not a court, to decide whether an investigation is even worth pursuing. *Cf. Dinler v. City of New York*, 607 F.3d 923, 948-49 (2d Cir. 2010) ("[W]e think that an intrusion into the executive branch's historic control over criminal investigations that unreasonably jeopardizes public safety amounts to a clear abuse of discretion, if not a judicial usurpation of power." (quotations omitted)).

8

Mr. X argues that his tweet does not constitute a "threat" on its face, and thus that the government has no legitimate, much less "compelling," interest in pursuing it. In particular, Mr. X stresses that his use of the term "I want to," as opposed to "I'm going to" or "I plan to," renders the tweet a mere expression of desire as opposed to a threat. But expressions of desire can still place a recipient "in fear of bodily harm or death," *Black*, 538 U.S. at 360. If Mr. X were standing next to Ms. Bachmann with a Vietnam-era machete in hand, and had spoken instead of tweeted the message, Ms. Bachmann would take cold comfort in those first few words. Wanting to do something is often, though not always, a predicate to actually doing something, and while history and literature may be full of reluctant killers, *see, e.g.*, William Shakespeare, Hamlet, *passim*; Crimes and Misdemeanors (Orion 1989), the Court is aware that many murderous members of our society do not share such trepidation. Use of the phrase "I want to" may signify an inchoate wish, or may indicate a goal toward which an individual is actively working. Mr. X's use of the word "want" instead of "plan" cannot be dispositive.

Additionally, Mr. X emphasizes the context of his tweets as a whole, and the ludicrous nature of the tweet at issue. With apologies for its reiteration, the Court must parse the exact language used. Mr. X's statement that he wants "to fuck Michelle Bachman in the ass with a Vietnam era machete" is indeed a grammatical threat. What Mr. X is describing is the forcible insertion of an extremely sharp, real-world weapon into Ms. Bachmann's rectum, which, if performed, would undoubtedly cause serious bodily injury—and likely death. On its face, the statement expresses a threat of violence.[10] And while the statement appears within a larger group

---

[10] Mr. X argues that his tweet is as absurd as if he had said, "I want to give Michele Bachmann a kick in the ass that will sender her all the way to Mars," or "I want to put Michele Bachmann in a time machine and send her back to the middle ages where she belongs." But these two analogies exist outside the realm of physical possibility. It is physically possible, though hopefully unlikely, that an individual could do to Michele Bachmann what Mr. X professed a desire to do in the tweet at issue.

9

of preposterous tweets, this does not automatically render the threat toothless. Again, it may well be that a court would find as a matter of law, or a jury might find as a matter of fact, that this tweet was simple "political hyperbole," *Watts*, 349 U.S. at 708, and not a "serious expression of an intent to commit an act of unlawful violence," *Black*, 538 U.S. at 349. But that is not the present inquiry. Mr. X has tweeted a *prima facie* threat, and the government is entitled to determine whether it is a true threat.

The Court is aware that this conclusion may seem to produce absurd results. Under this line of reasoning, the government could presumably subpoena any Web site any time any anonymous user made any post containing a mere scintilla of violence. The government could require Twitter to divulge the identity of a teenager who tweets, "My parents are so mean! I want to toss them in a ditch." Anonymity on the Internet would be sufficiently compromised to warrant this Court's concern.[11] But we are nowhere near that slippery slope. Here, an individual has made a statement that threatens an established candidate for the presidential nomination of one of our two major political parties, and the government has a strong public interest in investigating that threat, however outlandish.

Political assassination is one of the most destructive tools in the arsenal of domestic terrorism. The brutal and cowardly murders of Abraham Lincoln, James Garfield, William

---

[11] Part of the tension in applying the standard "compelling interest" test to this case arises because of the purported crime being investigated. Where the crime is unrelated to speech—assume, for example, Mr. X incriminated himself on his Twitter page with regard to a specific real-world crime for which the government was investigating suspects—it makes sense to ask merely whether the information sought is crucial to the grand jury's job in ascertaining probable cause. At that point, one not need inquire into the likelihood that the investigation will indeed produce a favorable probable cause determination. The merits of the investigation are irrelevant.

Here, though, the First Amendment applies doubly. It protects Mr. X's anonymity, and it limits the government's ability to criminalize Mr. X's speech. Its ability to do the former is, in the case law, divorced from the latter. But that seems as if it cannot be. If so, the government could eviscerate the right to communicate ideas that fall below the level of a true threat anonymously on the Internet. Nonetheless, this case presents a narrower inquiry.

10

McKinley, and John F. Kennedy have left an indelible stain on the collective consciousness of this nation. These abhorrent and devastating acts desecrate this country's very dignity and have irrevocably altered its history for the worse. And there have been no fewer than six close but unsuccessful attempts on the lives of our Presidents (Andrew Jackson, Harry Truman, Gerald Ford [twice], Ronald Reagan, and Bill Clinton), with an additional two attempts on a former President (George H. W. Bush) and a President-elect (Franklin Roosevelt). These despicable events have been some of the most traumatic and consequential moments in our Republic, ranking alongside the firing on Fort Sumter, Pearl Harbor, and September 11, 2001.

The United States of America has a nearly existential need to ensure the safety of its Commander-in-Chief. As Justice Breyer has explained:

> The physical security of the President of the United States has a special legal role to play in our constitutional system. The Constitution vests the entire "Power" of one branch of Government in that single human being, the "President" of the United States. He is the head of state. He and the Vice President are the only officials for whom the entire Nation votes. And he is responsible for the actions of the Executive Branch in much the same way that the entire Congress is responsible for the actions of the Legislative Branch or the entire Judiciary for those of the Judicial Branch. He has been called "'the sole indispensable man in government.'" Thus, one could reasonably believe that the law should take special account of the obvious fact that serious physical harm to the President is a national calamity . . . .

*Rubin v. United States*, 525 U.S. 990, 990-91 (Breyer, J., dissenting from denial of writ of certiorari) (citations omitted). Indeed, "[t]he Nation undoubtedly has a valid, even overwhelming interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats of physical violence." *Watts*, 394 U.S. at 707.

11

Although perhaps most destructive at the Presidential level, all political assassination attempts, successful or not, threaten the effective workings of our democracy. From the recent attempt on Congresswoman Gabrielle Giffords, to the untimely death of the Rev. Dr. Martin Luther King Jr., all such acts of villainy scar this country. The assassination of Robert F. Kennedy during his Presidential campaign constituted a grave blow, adding further pain to the still-lingering wounds dealt by his brother's demise. The safety and security of those who seriously aspire to the federal government's highest office is of paramount concern to each and every citizen because threats to Presidential candidates undermine the very legitimacy of our electoral process. Accordingly, law enforcement officials investigating possible threats to such candidates should not be required to automatically shut down their inquiry whenever a First Amendment question is raised. Merely issuing a subpoena to uncover the identity of the speaker so that the police can ascertain whether a threat is valid cannot be deemed a Constitutional violation.

It bears repetition that this matter is before the Court prior to the issuance of an indictment. No charges have been filed. No interviews with Mr. X have been arranged. This is a very preliminary step, in apparent good faith,[12] to see if the tweet at issue is in fact a "true threat." Other steps may infrequently be taken, and hopefully need not be taken in this case.

## III. CONCLUSION AND ORDER

---

[12] The defense of vindictive prosecution and the cause of action for malicious prosecution under the Federal Tort Claims Act allow an individual to challenge the institution of criminal proceedings against him for inappropriate reasons, such as a reprisal for the exercise of constitutional rights. *See Wayte v. United States*, 470 U.S. 598, 608 (1985) (discussing vindictive prosecution defense); *Moore v. Hartman*, 644 F.3d 415 (D.C. Cir. 2011) (involving malicious prosecution claim under FTCA). If the government lacks a good faith basis for its investigation, the most natural time to adjudicate that issue would be post-indictment. And although Mr. X argues that his tweet did not constitute a "true threat," Mr. X does not insinuate that the government lacks good faith, and the Court sees no reason to doubt the government's motives.

The government is investigating Mr. X for having made a *prima facie* threat of violence addressed to a major presidential candidate. The government has a compelling interest in pursuing that investigation, and Mr. X's identity must be known for the grand jury to make an informed probable cause determination. It is therefore hereby

ORDERED that Mr. X's Motion to Intervene is **GRANTED**; and it is further

ORDERED that Mr. X's Motion to Quash is **DENIED**.


Signed by Royce C. Lamberth, Chief Judge, on December 9, 2011.

13