In re S.W., Appellant.

No. 11–FS–11.

District of Columbia Court of Appeals.

Submitted March 6, 2012.
Decided June 7, 2012.

Christine Pembroke, Washington, DC, was on the brief for appellant.

Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, Rosalyn Calbert Groce, Deputy Solicitor General, and Janice Y.

Sheppard, Assistant Attorney General, were on the brief for appellee.

Before OBERLY and EASTERLY, Associate Judges, and KING, Senior Judge.

EASTERLY, Associate Judge:

Appellant, S.W., was adjudicated delinquent after being found guilty of felony threats to damage property, D.C.Code § 22–1810 (2001) *formerly* D.C.Code § 22–2307 (1981).[1] S.W. appeals, contending that the evidence was insufficient to find him guilty. We agree. The record reflects that the complainant, Cherie Gardner, and S.W. were friends with no history of animosity, much less violence. The day before the alleged threat was made Ms. Gardner experienced an upsetting incident when her house caught on fire. But her sensitivity about that scare did not turn words sung by fifteen-year-old S.W., who is not alleged to have had any connection to the fire, into a threat. Specifically, the fact that S.W. paraded back and forth on the sidewalk in front of Ms. Gardner, performing to a laughing audience and singing a modified rap song about setting the block and her house on fire, cannot reasonably be perceived as communicating a threat to damage Ms. Gardner's home. Because an essential element of the crime was not proved, we reverse S.W.'s adjudication of delinquency.[2]

## I. Facts

The complainant, Cherie Gardner, was the government's sole witness at trial. Ms. Gardner, age 22, testified that she and S.W., then age 15, had been neighborhood friends for about three and a half years. S.W. had been to her home on numerous occasions to play video games and watch movies and to attend parties and get-togethers. According to Ms. Gardner, prior to August 9, 2010, the date of the alleged offense, there was no "change in the nature of their relationship."

On the afternoon of August 8, 2010, however, Ms. Gardner experienced a frightening event. A vacant row house adjacent to the house where Ms. Gardner lived with her mother went up in flames.[3] The fire began to spread towards the upstairs portion of Ms. Gardner's house, and the firefighters at the scene broke holes in her ceiling to prevent the fire's progression. In the wake of this near calamity, Ms. Gardner became upset and angry. She was angry because, had the fire continued to spread, her mother, who was bedridden, could have been trapped.

When she evacuated the house, Ms. Gardner saw a number of young men, including S.W., gathered outside.[4] Ms. Gardner testified: "I was yelling in anger. I was yelling that when I find out who did this I would, I would try to handle it in any

1. The "Social Services Trial Form" entered by the trial court states that S.W. was found guilty, under the same statute, of felony threats to injure a person; however, this appears to be an error, as the government stated at trial that S.W. was not charged with threats to injure a person, and the trial court, in setting forth its findings, found S.W. guilty of threats to property.

2. Having determined that reversal is required on this ground, we do not address S.W.'s other arguments on appeal.

3. According to the "Affidavit and Request for Custody" of S.W., the fire investigators who responded to the scene at least initially determined that the fire was intentionally set. The record does not contain a report from the fire investigators, nor does it indicate if this was their final conclusion.

4. There is no evidence in the record that S.W. was in any way involved in or responsible for the fire; in setting forth its findings, the trial court stated that its conclusions were not tied to any such suspicion.

way I could because I didn't appreciate that, you know, the whole situation." Ms. Gardner acknowledged that she "didn't directly yell at anyone." She and S.W. then briefly exchanged words. Ms. Gardner was unable to recall at trial what S.W. said to her, although she stated that it "wasn't anything threatening." In response, Ms. Gardner yelled at S.W. in much the same manner as she had yelled at others who were at the scene of the fire. Ms. Gardner testified that "it was just a moment thing [sic], and that was the end of that." S.W. walked away shortly thereafter.

The following night, Ms. Gardner was sitting outside with some neighbors. Accompanied by three or four of his friends, S.W. walked back and forth on the sidewalk past Ms. Gardner approximately four or five times. On each turn, just after the group passed by Ms. Gardner, approximately fifteen to twenty feet away from her, S.W. sang snippets of what Ms. Gardner recognized to be a song by Lil Wayne,[5] with modified lyrics. The title of the Lil Wayne song adapted by S.W. is not in the record.[6] According to Ms. Gardner, however:

> the chorus of the song, pretty much the main part of the song where [S.W.] was singing [goes:] *they will say, he said, if I set this place on fire.* That's the main part of the chorus, but instead of him saying that he said, *we'll set this block on fire,* in that type of, in that way. (Emphasis added.)

According to Ms. Gardner, S.W.'s performance built on itself:

> When [S.W.] first walked—it was first ... *fuck the police.* Then it was, *fuck the police, Cherie,* and then it was, *we're not*

scared of the police, Cherie.* Then it seemed like every time he would walk back past he would say something else, and then that's when he came to the, *we will set this whole block on fire,* and then, *we will set your house on fire.* (Emphasis added.)

According to Ms. Gardner's testimony, S.W.'s demeanor appeared "[r]egular.... [H]e didn't seem aggravated or agitated or anything." When asked if he was "doing [anything] with his body," Ms. Gardner testified that S.W. "kind of arched [his back] I guess to help project." S.W. never faced towards her when he was singing:

> He didn't walk back and forth singing the song. He—when he was the distance away from me that's when he—it seemed like every time he got away from me that's when he would say something. When he was actually passing me he never said anything. It's just when he was the 20 feet away from me is when he said something.

Ms. Gardner acknowledged that throughout the performance S.W.'s friends were laughing. In response to the government's question—"Are you able to state whether or not [S.W.] was joking?"—Ms. Gardner initially testified, "I'm not sure. He didn't seem like he was joking to me." The government again asked for Ms. Gardner's subjective reaction to S.W.'s song, and received this response:

> Q: So, what were you thinking when you heard him say that?
>
> A: I thought he was serious.
>
> Q: Why did you think he was serious?

---

**5.** Lil Wayne is a multi-platinum hip hop artist whose raps "rang[e] from quick-tongued braggadocio about girls, cash and guns to gut-wrenching expressions of personal pain to instances of pure id." *Lil Wayne,* Rolling Stone, *http://www.rollingstone.com/music/artists/lil-wayne* (last visited May 4, 2012).

**6.** In his brief, appellant notes that "one of Lil Wayne's many songs is 'Burn this City.' "

A: Because the house next to our address got set on fire the day before.

At the end of his performance, S.W. and his friends sat on a brick wall; Ms. Gardner testified that she went home and told her mother about what happened. In response to the prosecutor's question, "How were you feeling at that time?" Ms. Gardner testified that she "was scared."

S.W. did not testify.[7] At the close of the government's case, and again at the close of evidence, S.W.'s counsel moved for acquittal on the ground that the government failed to establish every element of a felony threats charge.

Prior to announcing its verdict, the trial court stated that in order to find that S.W. had threatened Ms. Gardner, it had to find, beyond a reasonable doubt, that: (1) S.W. had spoken words to Ms. Gardner; (2) the words S.W. had spoken would cause a person reasonably to believe that his or her property would be damaged; and (3) when S.W. had said those words, he had intended for the person who heard them to believe that the property would be damaged. The trial court then adjudicated S.W. delinquent for making criminal threats.

The trial court credited Ms. Gardner's testimony in full. The court specifically found that S.W. sang the words as alleged, and sang them loudly, indicating an intention to be heard. The court ruled that "some of the things that were said . . . like 'fuck the police, we're not scared' . . . in and of themselves . . . are not a threat." But other words—"We'll set this block on fire. We'll set your house on fire"—did

constitute threats. The trial court did not address whether a reasonable listener would have believed that her property would be damaged, or whether S.W. intended Ms. Gardner to believe that he would burn her house down.[8] Regarding S.W.'s motivations, the court remarked only that testimony "about [Ms. Gardner] being outrageous and running her mouth at [S.W.] [on the day of the fire], that sort of gives [S.W.] motive to come back the next day and get back at her. . . ."

## II. Analysis

### A. Standard of Review

█ On appeal S.W. does not challenge any of the trial court's findings of fact; rather he argues that, accepting these findings as true, the evidence was insufficient as a matter of law to convict him beyond a reasonable doubt of threats to property. We review such challenges to the sufficiency of the evidence at trial *de novo*. *United States v. Bamiduro*, 718 A.2d 547, 550 (D.C.1998). Like a trial court reviewing a motion for a judgment of acquittal, *id.*, in conducting this review, "we view the evidence in the light most favorable to the government, recognizing the province of the fact finder to weigh the evidence, resolve issues of credibility, and to draw reasonable inferences from the evidence presented." *Griffin v. United States*, 861 A.2d 610, 613 (D.C.2004) (quoting *Smith v. United States*, 837 A.2d 87, 91–92 (D.C.2003)) (internal quotation marks omitted). "This court will reverse only where the government has failed to present evidence from which a reasonable

7. Instead of challenging the particulars of Ms. Gardner's testimony about the alleged threats, S.W. put on witnesses in support of an alibi. These witnesses testified that S.W. was with them during the days after the fire, although they differed on the details of when S.W. left and returned to the neighborhood.

8. S.W. did not ask the trial court to make specific findings pursuant to Super. Ct. Juv. R. 31(a).

mind might fairly infer guilt beyond a reasonable doubt." *Id.*

## B. The Law Regarding Criminal Threats

Section 22–1810 of the District of Columbia Code is entitled "Threatening to kidnap or injure a person or damage his property." It provides that:

> [w]hoever threatens within the District of Columbia to kidnap any person or to injure the person of another or physically damage the property of any person or of another person, in whole or in part, shall be fined not more than $5,000 or imprisoned not more than 20 years, or both.

This court has held that a criminal threat[9] requires proof of three elements: "(1) that the defendant uttered words to another person"; "(2) that the words were of such a nature" to cause "the 'ordinary hearer'" reasonably to believe that the threatened harm would take place; "and (3) that the [defendant] intended to utter the words as a threat."[10] *Clark v. United States,* 755 A.2d 1026, 1030 (D.C.2000) (citing *Baish,* 460 A.2d at 42); Criminal Jury Instructions for the District of Columbia, No. 4.130 (5th ed. rev.2011).

With respect to the second element, our cases have stressed that the context in which words are spoken is critical. In *Jenkins,* we said that "the words uttered by the defendant must be considered in the context in which they were used." 902 A.2d at 85. Similarly, in *Clark,* we said that "[w]ords cannot always be read in the abstract and often acquire significant meaning from context[.]" 755 A.2d at 1031. Whether an utterance conveys an objective threat of harm turns not only on the "facial expression, tone, stress, posture, inflection, and like manifestations of the speaker," but also on the "factual circumstances of their delivery." *Id.*

In *Clark,* this court determined that ambiguous words to a police officer by a person being placed under arrest—"wait until I tell the boys, they will take care of you,"—could objectively be perceived as a threat from their context. 755 A.2d at 1028. In *Jenkins,* this court determined that words innocuous on their face—"what might otherwise have been a civilized 'invitation' to come outside"—"could be quite terrifying" and objectively perceived as a threat in light of defendant's statement three weeks prior that she would shoot the complainant if she did not repay a debt. 902 A.2d at 86. This case presents a third factual permutation—whether words

---

9. The basic elements for felony and misdemeanor threats are the same. *See United States v. Baish,* 460 A.2d 38, 41 (D.C.1983) (citing *United States v. Young,* 376 A.2d 809 (D.C.1977) ("We have interpreted the elements of this misdemeanor [D.C.Code § 22–507 (1973), recodified as D.C.Code § 22–407 (2001),] to be the same as those of its subsequently enacted felony counterpart, D.C.Code § 22–2307 (1973) [recodified as D.C.Code § 22–1810 (2001) ].")).

10. The intent element has been subject to controversy due to a competing formulation that requires only "that the defendant intended to utter the words which constituted the threat." *Joiner–Die v. United States,* 899 A.2d 762, 764 (D.C.2006); *see Jenkins v. United States,* 902 A.2d 79, 87 n. 11 (D.C.2006) (noting that the conflict "might be more appropriately addressed by the court sitting en banc"). Here, the trial court believed that the prosecution was required to prove that S.W. specifically intended Ms. Gardner to believe that her property would be damaged. The government did not object to this articulation of the law, and it appears to concede on appeal that specific intent is required. However, because we conclude the government failed to prove the second, "ordinary hearer" element of the offense, there is no need to resolve whether proof of specific intent was required or presented in this case.

threatening on their face can be rendered benign by their context.

The answer must be yes. An actor's pronouncement from the stage, "The first thing we do, let's kill all the lawyers,"[11] cannot reasonably be perceived as a threat by the bar members in the audience. Similarly, the utterance "I'm going to kill you," when stated, with a laugh, to a friend after the friend has somehow discomfited the speaker cannot reasonably be perceived as a threat. A threat is more than language in a vacuum. It is not always reasonable—and sometimes it is patently irrational—to take every pronouncement at face value.

 Indeed, even when statements are threatening on their face, it is essential to consider and give full weight to context in order to ensure that the District's threats statutes are applied within constitutional parameters. As the Supreme Court held in *Watts v. United States*,[12] and this court acknowledged in *Jenkins*,[13] "[A] statute ... which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly

in mind. What is a threat must be distinguished from what is constitutionally protected speech." 394 U.S. at 707, 89 S.Ct. 1399. It is a cornerstone of our democracy that the First Amendment generally "bars the government from dictating what we see or read or speak or hear." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002). "True threats" are an exception to this rule and may be criminalized without violating the First Amendment. *Virginia v. Black*, 538 U.S. 343, 359, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003). But speech is only a "true threat" and therefore unprotected under the Constitution if an "ordinary reasonable recipient who is familiar with the[ ] context [of the statement] would interpret"[14] it as a "serious expression of an intent to cause a present or future harm."[15]

Thus, courts have struck threats convictions on First Amendment grounds where facially threatening language placed in context cannot reasonably be perceived as a threat. *See, e.g., Watts*, 394 U.S. at 708, 89 S.Ct. 1399; *Alexander*, 418 F.2d at

**11.** William Shakespeare, *The Second Part of King Henry the Sixth* act 4, sc. 2.

**12.** 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (per curiam).

**13.** 902 A.2d at 85.

**14.** *United States v. Armel*, 585 F.3d 182, 185 (4th Cir.2009) (quoting *United States v. Roberts*, 915 F.2d 889, 891 (4th Cir.1990)) (internal quotation marks omitted); *see also Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1074 n. 7 (9th Cir.2002) (en banc) (noting that a majority of circuits have adopted an objective interpretation test). In *Alexander v. United States*, the D.C. Circuit held that "[n]either 'idle talk' nor mere 'jest' is a true threat," 418 F.2d 1203, 1206 (D.C.Cir.1969) (citation and internal quotation marks omitted), but has not since revisited the parameters of the "true threat" doctrine. *See In re Grand Jury Subpoena No. 11116275*, Misc. No.

11–527 RCL, 2012 WL 691599, at *3 n. 8 (D.D.C. Feb. 23, 2012) (noting the dearth of case law on this topic). Nonetheless, it appears that application of an objective standard and consideration of "alleged threats ... 'in light of [their] entire factual context,' " is unquestioned in this jurisdiction too. *United States v. Syring*, 522 F.Supp.2d 125, 130 (D.D.C.2007) (alteration in original) (quoting *United States v. Dinwiddie*, 76 F.3d 913, 925 (8th Cir.1996)).

**15.** *Doe v. Pulaski Cnty. Special Sch. Dist.*, 306 F.3d 616, 622 (8th Cir.2002) ("All the courts to have reached the issue have consistently adopted an objective test that focuses on whether a reasonable person would interpret the purported threat as a serious expression of an intent to cause a present or future harm."); *Syring*, 522 F.Supp.2d at 129 (reaching the same conclusion).

1207. Similarly, courts have held that arrests based on statements that are not objectively threatening violate the First Amendment. For example, in *Fogel v. Collins*, 531 F.3d 824 (9th Cir.2008), the Ninth Circuit held that a van parked in an apartment complex, painted with the messages, "I AM A FUCKING SUICIDE BOMBER COMMUNIST TERRORIST!" and "ALLAH PRAISE THE PATRIOT ACT … FUCKING JIHAD ON THE FIRST AMENDMENT! P.S. W.O.M.D. ON BOARD!" and "PULL ME OVER! PLEASE, I DARE YA[,]" *id.* at 827, did not convey a true threat for First Amendment purposes, "in light of the full context available to someone observing the van." *Id.* at 831 (noting that the "remainder of the van displayed innocuous images and phrases, including some with spiritual meaning, created through the artistic endeavors of [the van owner] and his friends"). "It makes no difference that the speech, taken literally, may have communicated a threat. Understood in its full context, no reasonable person would have expected that viewers would interpret [the van owner's] political message as a true threat of serious harm." *Id.* at 832 (citing *Watts*, 394 U.S. at 708, 89 S.Ct. 1399; *Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 372 (9th Cir.1996)).

In short, a determination of what a defendant actually said is just the beginning of a threats analysis. Even when words are threatening on their face, careful attention must be paid to the context in which those statements are made to determine if the words may be objectively perceived as threatening.[16]

## C. The Insufficiency of the Evidence in This Case

■ The trial evidence established that S.W. made facially threatening statements to Ms. Gardner; he modified words to a Lil Wayne song and sang: "We will set this whole block on fire"; "[w]e will set your house on fire." To determine whether there was an adequate foundation for the trial court's determination that S.W. was guilty of uttering a criminal threat, however, we must determine if an objective listener would perceive S.W.'s lyrics as a threat. We look to what "a reasonable person" in Ms. Gardner's "position in light of the preceding history" with S.W. would think. *Jenkins*, 902 A.2d at 85. Viewing the facts in the light most favorable to the government, we conclude that there is no basis for a determination that a reasonable person in Ms. Gardner's position would believe that S.W. meant to damage her house. Thus, in at least one essential respect, the trial court's determination that S.W. was guilty was without evidentiary support, and therefore S.W.'s adjudication cannot stand.

We begin by observing that there are three recurring fact-patterns in which this court has determined that the underlying situation presents some substantive reason—beyond the particulars of the utterance itself—for an objective listener's belief that the defendant is inclined to do harm and that the threat should be taken seriously: (1) the defendant makes statements in the context of a volatile or hostile relationship;[17] (2) the defendant makes statements aimed at avoiding or subvert-

---

**16.** *See Fogel*, 531 F.3d at 832 ("[T]he 'textual context' of how the speech was communicated is key.").

**17.** *See, e.g., Jenkins*, 902 A.2d at 81–84 (defendant had previously threatened the life of the complainant regarding an unpaid debt, and

was banging and kicking the door demanding that she come out); *Tolentino v. United States*, 636 A.2d 433, 434 (D.C.1994) (defendant, who slipped a note under complainant's door threatening to kill him and to set his car on fire, had previously left at least four similar notes and had banged on complainant's win-

ing prosecution for other crimes;[18] and (3) the defendant makes statements to law enforcement officers acting in the course of duty.[19] When one of these scenarios is present, we have generally upheld convictions for threats, under D.C.Code § 22–407 or § 22–1810, against challenges of evidentiary insufficiency. This case is unlike any of our prior cases upholding threats convictions.

First, the evidence below established that S.W. and Ms. Gardner did not have a hostile or even a volatile relationship. S.W. was someone Ms. Gardner had known and been friends with for years, and he was a familiar presence in her home. There was no evidence that he had

ever been violent toward her. And notwithstanding her outburst at him the night before the alleged threat—an exchange she herself characterized as "just a moment thing"—Ms. Gardner testified that prior to the date of the alleged offense, there had been no "change in the nature of their relationship." Second, there is no evidence to suggest that S.W. was attempting to thwart detection of any criminal activity or wrongdoing. There is no evidence or basis in the record for a reasonable inference that S.W. was in any way involved in the August 8 fire. Ms. Gardner did not testify that she had at any point believed or had reason to believe that S.W. caused the fire.[20] And the trial court

dow air conditioner saying, "Come out, I will kill you."); *Campbell v. United States*, 450 A.2d 428, 429 (D.C.1982) (defendant had fired shots into the door of his ex-girlfriend's apartment immediately before telling her that "it did not matter what she or the police did, he was 'going to get her.'"); *Gurley v. United States*, 308 A.2d 785, 786 (D.C.1973) (defendant struck the complainant in the face, kicked her in the stomach, and returned to throw a brick through her apartment window in the hours before he made a phone call threatening to kill her and burn down her apartment).

18. *See, e.g., Griffin*, 861 A.2d at 612 (awaiting trial for murder, defendant told complainant to convey to a potential witness, that "something life-threatening[,] something bad" would befall her if she did not go to his court hearing) (alteration in original); *Evans v. United States*, 779 A.2d 891, 893 & n. 1 (D.C. 2001) (defendant stated that he was going to kill the police officer who had just testified against him); *Joiner v. United States*, 585 A.2d 176, 177–78 (D.C.1991) (defendant accosted two restaurant employees, who had identified him to police as the perpetrator of a shooting the night before, and touched one on the nose and struck the other above the eye while uttering, "I will remember this," "I will get you for this," and "[I don't] forget faces") (alteration in original); *Holt v. United States*, 565 A.2d 970, 971–72 (D.C.1989) (en banc) (defendant said, "I'm gonna get you, bitch" to complainant who recognized him as her as-

sailant in a mugging earlier that day); *Beard v. United States*, 535 A.2d 1373, 1377 (D.C. 1988) (awaiting trial for armed robbery, defendant approached an undercover police officer and attempted to contract a witness's murder).

19. *See, e.g., Haney v. United States*, 10–CF–150, 2012 WL 1427794, at *1, *3–4 (D.C. Apr. 26, 2012) (during police officer's testimony at detention hearing, defendant pointed index finger at officer, moved his thumb up and down in gesture mimicking a gun, and mouthed the words, "I'm going to fuck you up"); *Joiner–Die*, 899 A.2d at 765 (in response to police officer's instruction, defendant "exited his vehicle, with an angry look on his face, reached into his front jacket pocket and stated 'I'm going to bust your ass,' or 'I'm going to bust your mother f[*]cking ass'") (alteration in original); *Clark*, 755 A.2d at 1028 (see *supra*); *Postell v. United States*, 282 A.2d 551, 552–53 (D.C.1971) (outside courtroom where prostitution case was underway, defendant told police officer that "if he saw him 'locking up one of his girls one night'" he would 'blow (his) m.f. brains out'" and told another officer, 'the next time I see you locking up any of my girls, I am going to have to f * * * you up'") (alteration in original).

20. The evidence established that Ms. Gardner yelled at the crowd gathered outside because she was generally angry about the fire, and

stated both that there was no evidence linking S.W. to the fire and that it was not drawing any inference that there was a connection.[21] Third, unlike cases involving threats to law enforcement, Ms. Gardner was not in a position of power or authority over S.W., and he was not trying to interfere with her in the exercise of any duty.[22] There is no indication that Ms. Gardner's interests were in any way adverse to S.W.'s; she did not present any sort of obstacle to him. Again, by her account, they were friends.

That the facts presented in this case are distinctive is by no means dispositive. We have never held that legitimate threats convictions are limited to the three scenarios described above. But since this case is different, we must ask, what else, if anything, we can adduce from the totality of the circumstances that could reasonably lead an objective observer to fear property damage as the result of S.W.'s statements.

S.W.'s actions themselves were not inherently ominous such that they would convey a threat to an objective observer. The evidence established that he was walking back and forth on the sidewalk, imitating a hip hop sensation, and making his friends laugh at Ms. Gardner's expense. During his public performance, S.W. was not outwardly violent or menacing. He did not display any anger. His demeanor was "regular." Like any good performer, he made sure that his audience could hear him: Ms. Gardner noted that he "kind of arched [his back] I guess to help project." After four or five passes, he and his companions retreated to sit on a nearby wall and did nothing more to bother her. An objective observer might perceive a teenager[23] engaged in jesting, teasing, mocking, even insult and humiliation—but would not reasonably perceive that S.W. posed an actual threat of arson.

What we are left with is the fact of the fire the day before and how that event made Ms. Gardner subjectively feel. The government posits that "the fire that burned [Ms. Gardner's] house the day before and the discussion she had with [S.W.] following the fire" provides objectively reasonable circumstances for an ordinary hearer in Ms. Gardner's position to believe that S.W. was going to set her house on fire. We disagree.

To be sure, if S.W. had caused the fire, this would be an easy case. It could readily be categorized with others involving (1) volatile or hostile relationships, where the threat was preceded by some prior violent or hostile conduct on the part of the defendant;[24] or (2) an effort to avoid apprehension for other criminal activity. A connection to the fire would have evinced to a

---

that she directed her anger at S.W. after he made an unspecified comment to her.

**21.** Although the trial court determined that S.W. had also said "fuck the police, Cherie. We're not scared of the police, Cherie," it ruled that these statements were not threats.

**22.** *See Postell,* 282 A.2d at 553 ("A threat that is to be activated if the intended victim carries out some act that is his legal or moral duty to perform is very real indeed and certainly cannot be deemed to be remote.").

**23.** In assessing his conduct objectively, S.W.'s relative youth is relevant. As the Supreme Court has acknowledged, a child's age "is a fact that generates commonsense conclusions about behavior and perception" that "are self-evident to anyone who was a child once himself," including the observation that "children generally are less mature and responsible than adults[.]" *J.D.B. v. N. Carolina,* —— U.S. ——, 131 S.Ct. 2394, 2403, 180 L.Ed.2d 310 (2011) (citations and internal quotation marks omitted).

**24.** *E.g.,* a kick to the stomach (*Gurley*), a banging, kicking, or shooting at the door (*Jenkins, Campbell*), or a previous threat (*Jenkins, Tolentino*); see *supra* note 17.

reasonable hearer that S.W.'s facially threatening language was not idle and should be taken seriously. But the fire cannot serve as an objective basis for perceiving S.W.'s song as a threat in this case, notwithstanding Ms. Gardner's testimony that it was the fire that prompted her to believe that S.W. was "serious" when he sang his song. In the absence of any indication that S.W. was involved in the fire, the fact of the fire itself says nothing about S.W.'s predisposition or propensity to commit arson.[25]

Put another way, Ms. Gardner's subjective response, although entirely understandable, does not change the objective calculus as to whether S.W. posed a threat to her home. Certainly, as the fresh victim of an apparent arson, it can be expected that Ms. Gardner's sensitivities would be heightened. But every statement that causes a hearer fear or painful memories is not a threat; our interpretation of the law of criminal threats must leave some room for speech that is less than perfectly sensitive.

Finally, what the government characterizes as "the discussion [Ms. Gardner] had with [S.W.] following the fire" does not provide a reasonable basis for perceiving S.W. as a threat the next day. As a preliminary matter, it was never established what S.W. said to Ms. Gardner to prompt her to yell at him. But whatever it was, she described their brief exchange as "just a moment thing." She testified that S.W.'s demeanor was in no way angry or threatening during that encounter, and that afterward, he simply walked away. Moreover, as noted above, when she was asked why she thought S.W. was "serious" she testified that it was "[b]ecause the house next to our address got set on fire

the day before"—not because of anything S.W. said after the fire. Even accepting that S.W.'s performance was a response to Ms. Gardner's emotional outburst the day before, it is not reasonable to conclude that an ordinary hearer would believe, on the facts presented, that S.W., a friend, would burn down a house in retaliation for a momentary spat.

In sum, what we have here is a disturbing event, an upset and angry young woman, and facially threatening words which—when placed in the context of S.W.'s acknowledged and unaltered friendship with Ms. Gardner and S.W.'s manner of delivery—cannot be reasonably and objectively perceived as communicating a threat to property.

For the foregoing reasons, appellant's adjudication of delinquency is reversed.

*So ordered.*

---

**25.** In the eyes of a pickpocket's latest victim, the world may suddenly appear over-run with thieves, but the victim cannot rationally use that experience as a basis for believing that anyone in particular (besides the thief) is more likely to steal.