*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-AA-0750

CATHOLIC CHARITIES – 801 EAST MEN'S SHELTER, PETITIONER,

V.

JAMAR BYRD, RESPONDENT.

On Petition for Review
of a Decision of the Office of Administrative Hearings
(2024-SHEL-00148)

(Argued April 9, 2025                    Decided May 29, 2025)

*Ian L. Slingsby,* with whom *Brian W. Stolarz* was on the brief, for petitioner.

*Laura D. Niday*, with whom *James E. Rocap III* was on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and EASTERLY and MCLEESE, *Associate Judges*.

EASTERLY, *Associate Judge*: Shelters that provide housing to individuals experiencing homelessness provide a critical service. Under the Homeless Services Reform Act of 2005 (HSRA), D.C. Code §§ 4-751.01 to 4-756.07, such shelters may terminate that housing only for cause and only by the statutorily mandated processes. The HSRA authorizes two tracks for termination. Pursuant to section 4-754.36 and section 4-754.33(c), a shelter may terminate services to a client for an array of

enumerated reasons with fifteen days' notice, thereby giving the client time both to challenge the termination, *see id.* § 4-754.41(d), and, presumably, to try to find other housing. Alternatively, pursuant to section 4-754.38, a shelter may terminate services on an "emergency" basis without any advance notice to a client. Given its harsh result, emergency termination is permitted in limited situations; a shelter may only exercise this authority where the client "presents an imminent threat to the health or safety of the client or any other person on a provider's premises," taking into account "the severity of the act or acts leading to the imminent threat." *Id.* § 4-754.38(a).

In this case, petitioner Catholic Charities – 801 East Men's Shelter (Catholic Charities) appeals from the reversal of its emergency termination of respondent Jamar Byrd by the Office of Administrative Hearings (OAH). Catholic Charities argues that the OAH administrative law judge (ALJ) incorrectly "restricted" its analysis of Mr. Byrd's conduct and elevated the "severity" standard beyond that which is required by D.C. Code § 4-754.38(a). But we conclude that the ALJ correctly understood and applied the law and that Catholic Charities' argument to the contrary is based on a mischaracterization of the ALJ's ruling and the record evidence. We reject as unpreserved Catholic Charities' argument that the ALJ wrongly precluded it from presenting evidence of Mr. Byrd's alleged history of

violent acts. And we reject as meritless Catholic Charities' argument that the ALJ wrongly discredited its witness. Accordingly, we affirm.

## I.     Procedural History and Facts

Catholic Charities' effort to remove Mr. Byrd from the 801 East Men's Shelter, where he was a participant in the "work-bed program," began well before the shelter issued the 2024 emergency termination notice at issue in this case.[1] In October 2023, Catholic Charities issued a non-emergency notice of termination under D.C. Code § 4-754.36, which the ALJ reversed in January 2024 after Mr. Byrd requested a hearing to challenge the termination and Catholic Charities failed to comply with the ALJ's directive to file a status report. On March 14, 2024, Catholic Charities removed Mr. Byrd from the shelter, without notice, forcing Mr. Byrd to sleep outside for several days. On March 21, 2024, the ALJ instructed Catholic Charities that termination without the requisite fifteen-day notice, *see* D.C. Code § 4-754.33(c), was not permitted, and, on March 22, shelter staff emailed Mr. Byrd advising him that he was allowed to return to the shelter. Also on March 22, Catholic Charities issued a new, non-emergency notice of termination based on allegations that Mr. Byrd "g[ot] physical" with security staff at the shelter when they attempted

---

[1] The same ALJ appears to have handled Mr. Byrd's challenges to two prior attempts by Catholic Charities to remove him from the 801 East Men's Shelter. The ALJ took "official notice" of its orders disposing of these prior cases.

to unlawfully remove him on March 14. The effective termination date of the March 22 notice was April 6, 2024. But when Mr. Byrd returned to the shelter on the evening of March 22, security staff again attempted to remove him, resulting in a confrontation in the shelter cafeteria.

Later that evening, Catholic Charities filed a Notice of Emergency Termination pursuant to D.C. Code § 4-754.38, alleging that it was entitled to immediately terminate services to Mr. Byrd because he posed an "imminent threat to the health and safety of [him]self or any other person" at the shelter. The notice specifically alleged that, after refusing to accept service of the non-emergency termination notice when he returned to the shelter on March 22, Mr. Byrd had "pushed" a security officer[2] (Major Flippen), had been generally "non-compliant" and "hostile," and had threatened to kill officers and/or shelter staff. Mr. Byrd challenged the emergency termination, and the case proceeded to an evidentiary hearing in June 2024. At the hearing, Catholic Charities presented testimony from Jonetta Carpenter, a program supervisor at the shelter, and Mr. Byrd testified on his own behalf.

---

[2] Catholic Charities did not present any evidence as to who employs the security officers at the 801 East Men's Shelter or what their authorized powers are. Record documents refer to them as both "SPOs" and "USP Officer[s]" without further elaboration.

Ms. Carpenter testified that Mr. Byrd entered the shelter on the evening of March 22, 2024, and "walk[ed] past the front desk." Ms. Carpenter "tried to stop [him] to give him" the non-emergency termination notice issued that day,[3] but Mr. Byrd told her "catch me if you can" and proceeded to the cafeteria. At that point, Ms. Carpenter testified, she asked security to "go down" to the cafeteria and "bring Mr. Byrd back up." Ms. Carpenter did not immediately accompany the security officers and thus was not in the cafeteria when they first confronted Mr. Byrd. Apparently relying in part on what she observed in video footage of the incident, she testified that after "[s]ecurity went down [to the cafeteria] to try to get Mr. Byrd[,] [h]e became very, very hostile, started threatening, pushing, shoving all officers on duty." She then read directly from an incident report, which stated that

---

[3] During the evidentiary hearing, counsel for Catholic Charities introduced as an exhibit the original, non-emergency, March 22, 2024, notice that Ms. Carpenter tried to serve. Counsel did not ask for, and Ms. Carpenter did not provide, any details about the basis for that notice (on which she was not listed as a witness to the precipitating incident), other than to say that the notice was "based on conduct that is set forth in the final page of the exhibit."

Counsel for Catholic Charities also did not question Ms. Carpenter about Catholic Charities' October 7, 2023, non-emergency termination notice (for which Ms. Carpenter was also not a listed witness). Though counsel began a line of questioning about this notice to "demonstrate that [Mr. Byrd] has a history of non-compliance with program rules," when the ALJ questioned the relevance of this earlier notice, counsel offered to "jump right to" the March 2024 emergency termination if the ALJ preferred. And when the ALJ indicated that was his preference, counsel moved on without asking further questions about the October 7 notice.

when Mr. Byrd got to the cafeteria, "he was hostile, aggressive, threatening towards security, cafeteria staff," and that "[s]ecurity tried to calm Mr. Byrd down, but . . . he was noncompliant and became more hostile." Ms. Carpenter further testified that Mr. Byrd "pushed Major Flippen" and said both that "he would have all of them killed before the week was out" and that "when he returned from police custody, he w[ould] come kill them himself."

Ms. Carpenter conceded that no one from Catholic Charities ever served Mr. Byrd with the March 22 non-emergency termination notice but gave seemingly conflicting testimony as to whether anyone tried to do so after he refused to stop at the front desk. She initially indicated that she attempted to serve him again after security brought him back upstairs from the cafeteria. She subsequently stated that, at that point, "security had the paperwork"—suggesting that, once security staff got involved, it was their responsibility to serve Mr. Byrd—but then testified that both she and security possessed copies of the notice without explaining whether or how she made further attempts at service. Ms. Carpenter could not recall whether she ever saw the security officers attempt to serve the notice on Mr. Byrd. She conceded that, given the April 6 effective date of the termination, at the time of the confrontation on March 22, Mr. Byrd was within his rights to remain in the shelter.

Mr. Byrd told a different story. He testified that he had been sleeping outside in the wake of his March 14 removal from the shelter, and he received an email on March 22 from a Catholic Charities senior program manager informing him that he was allowed to return. He arrived at the shelter at around 6:30 that evening. As he entered, somebody—he believed it to be a female security officer—told him that he was not allowed in the building, but Mr. Byrd ignored her.[4] Proceeding to the cafeteria, Mr. Byrd served himself some food, at which point two security officers approached him, one of whom "was very aggressive[,] telling me I was not allowed to eat." The officers "grabbed my food and threw [it] in the trash can," telling him repeatedly that he was "not allowed in the building." A third officer, Major Flippen, arrived and was "super aggressive" towards Mr. Byrd, "pushing me, grabbing my shirt, all of this stuff" and telling him "[y]ou['re] not supposed to be in the building[,] [y]ou need to leave."[5] Ultimately, according to Mr. Byrd, Major Flippen "grab[bed]" him and "tried to handcuff" him, at which point they began "wrestling,"

---

[4] Mr. Byrd explained that his understanding was that he not required to stop and talk with anyone at that entrance, which was the entrance to the "A Side" of the shelter, because he was a resident of the "B Side." He also testified that Ms. Carpenter and other shelter staff members "ha[d] been trying to terminate me and find ways to remove me from the shelter . . . since I've been in a work-bed program" but that he understood that "they can't just easily remove me."

[5] Mr. Byrd testified that security officers at the shelter "have a strategy. They try to get in your face, get loud, and do light touches so that you'll react. And then they'll try to say you assaulted them or did something to them."

with Mr. Byrd attempting to "physically" remove himself because he did not believe security had a right to touch him or remove him.

Mr. Byrd testified that, during the course of the confrontation, no one ever attempted to serve him with the termination notice. Instead, "[t]hey told me you have to leave right now. You don't have no right to be here. They never showed me no documentation."

Because these two narratives were so divergent, at the conclusion of the witness testimony, the ALJ informed the parties that he wanted to see the video footage of the incident. The footage, produced by Catholic Charities in multiple forty-five second segments that did not include audio, largely aligned with Mr. Byrd's account. It showed Mr. Byrd getting food in the cafeteria when two security officers approached him, at which point Mr. Byrd walked away from the officers and back to his table. The two officers followed Mr. Byrd and appeared to speak to him for several seconds. Mr. Byrd took several steps away from them, backing up against a nearby wall, as a third officer joined the group. One of the officers then took Mr. Byrd's plate of food from the table and threw it in a trash can. A fourth officer entered the cafeteria. Mr. Byrd continued to talk to the four officers, at one point going to look inside the trash can where his food had been discarded.

Two officers then advanced on Mr. Byrd, who retreated to his table and sat down in his chair. One officer—apparently Major Flippen—came up very close to where Mr. Byrd sat, standing directly over him, at which point Mr. Byrd stood back up; the officer then appeared either to reach for Mr. Byrd's bag or to put his hands on Mr. Byrd's body. Major Flippen next moved Mr. Byrd's chair away from him and then, a moment later, picked the chair up and put it on the table. Mr. Byrd pushed Major Flippen away from him, but then appeared to continue talking to the officers off and on for about another two and a half minutes; at times, officers also appeared to be talking to other residents.[6] Four more officers then arrived in the cafeteria, along with Ms. Carpenter. Almost immediately, all eight officers surrounded Mr. Byrd, and several grabbed hold of him. In response, Mr. Byrd began to struggle against being restrained.

After reviewing the video, the ALJ issued its final order. The ALJ considered that "a little over a week before the incident" in the cafeteria, Catholic Charities had "unlawfully removed [Mr. Byrd] from [its] WorkBed program without proper notice" and "bagged up and locked away [his belongings] without his consent." The ALJ found that when Mr. Byrd returned to the shelter on March 22, as he had been

---

[6] At one point, Mr. Byrd walked away from the officers and appeared to speak to other residents in the cafeteria, but since the video has no audio, it provides no evidence of what he said or the volume at which he said it.

told he was authorized to do, the security officers "[a]lmost immediately" "accosted" him while he was trying "to eat a meal" and "incorrectly informed [him] that he was not allowed to be at the shelter." The ALJ found that Major Flippen "stood over [Mr. Byrd] in an intimidating manner," "took away [Mr. Byrd's] chair and put his hand on [Mr. Byrd's] bag" and person,[7] and "[i]t was only at this point, after suffering multiple indignities, that [Mr. Byrd] pushed the much larger [Major] Flippen away from him." "Soon thereafter," security officers "encircle[ed]" Mr. Byrd, "grabbed [him] by his arms and began dragging him toward the exit," causing Mr. Byrd to "resist[]" their "attempts to drag him from the cafeteria." Ultimately, the officers handcuffed him and led him away.

The ALJ found that Ms. Carpenter was "only present for part of the cafeteria incident," noting that Mr. Byrd was already "under the control of several security officers by the time [she] entered that cafeteria." The ALJ further observed that Ms. Carpenter had "difficulty remembering" details, and much of her narrative was uncorroborated or was directly contradicted by the video footage. Accordingly, the ALJ gave "Ms. Carpenter's testimony reduced weight" and specifically chose not to credit her testimony that, while in the cafeteria, Mr. Byrd "said he would have all of

---

[7] The ALJ did not mention the fact that one of the officers had thrown away Mr. Byrd's food but did find that the officers instructed the cafeteria staff not to serve Mr. Byrd.

them killed before the week was out."

The ALJ determined that "push[ing] a security officer . . . was unquestionably a violent act on shelter grounds." Nonetheless, he concluded that, "in light of the actions of [Catholic Charities'] staff and security officers which le[d] up to that act," Mr. Byrd's actions "did not rise to the severity contemplated by [D.C. Code] § 4-754.38(a) to warrant an emergency termination of services." "Similarly," the ALJ concluded that "Mr. Byrd's resistance to being surrounded and manhandled by upwards of eight of [Catholic Charities'] security staff, in their questionable attempt to physically remove [him] from the cafeteria," did not justify emergency termination of services. This appeal followed.

## II.    Discussion

### A. "Imminent threat to . . . health or safety" under the HSRA

Catholic Charities first argues that the ALJ adopted an overly "restricted" interpretation of D.C. Code § 4-754.38, which governs emergency terminations, by identifying, and focusing its analysis on, only a "single act of violence" by Mr. Byrd, rather than taking a more holistic view and considering "whether there was an 'act or credible threat of violence' that leads to an 'imminent threat to the health or safety.'" Catholic Charities further argues that, as a matter of law, the facts in this

case satisfy the severity requirement under the statute. We conclude, preliminarily, that Catholic Charities mischaracterizes the ALJ's reasoning when it suggests he focused only on a "single act of violence" at the exclusion of the broader statutory requirements, and we uphold the ALJ's ruling that Mr. Byrd's actions were not sufficiently severe to warrant emergency termination. The parties do not squarely address whether this latter question is a factual one to be reviewed under the substantial evidence standard or a question of law to be reviewed de novo.[8] We need not decide whether this more closely resembles a question of law or fact because we conclude that the ALJ's order was correct under either standard of review.

D.C. Code § 4-754.38 provides an emergency exception to the normal process for termination of homeless services. In general, a provider may only terminate

---

[8] Generally, our court reviews an agency decision to ensure that "the decision contains findings on each material, contested issue of fact; substantial evidence supports each factual finding; the decision's legal conclusions flow rationally from the factual findings; and the decision is not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law." *Tyler v. George Washington Med. Fac. Assocs.*, 75 A.3d 211, 213 (D.C. 2013). "We defer to the ALJ's factual findings if they are supported by substantial evidence, but legal conclusions . . . are reviewed *de novo.*" *Id.* (quoting *Johnson v. So Others Might Eat, Inc.*, 53 A.3d 323, 326 (D.C. 2012)). When we are confronted with mixed questions of fact and law, "we consider, among other things, 'whether the issue to be decided more closely resembles one of fact or of law, and whether the trial court or the appellate court is in a position to render the decision with the higher degree of accuracy.'" *Miller v. United States*, 14 A.3d 1094, 1120 (D.C. 2011) (footnote omitted) (quoting *Griffin v. United States*, 618 A.2d 114, 118 (D.C. 1992)).

services under certain enumerated circumstances, D.C. Code § 4-754.36 (governing standard, non-emergency terminations),[9] and it must give notice to the client at least fifteen days before the termination goes into effect, *id.* § 4-754.33(c) (directing that "[a]ll providers shall give written and oral notice to clients of

---

[9] The statute authorizes a provider to "terminate its delivery of services to a client only when," after documenting its consideration of lesser measures, D.C. Code § 4-754.36(a)(1),

> (2) The client:
>
> > (A) Possesses a weapon on the provider's premises;
> >
> > (B) Possesses or sells illegal drugs on the provider's premises;
> >
> > (C) Assaults or batters any person on the provider's premises;
> >
> > (D) Endangers the client's own safety or the safety of others on the provider's premises;
> >
> > (E) Intentionally or maliciously vandalizes, destroys, or steals the property of any person on the provider's premises;
> >
> > (F) Fails to accept an offer of appropriate permanent housing that better serves the client's needs after having been offered 2 appropriate permanent housing opportunities; or
> >
> > (G) Knowingly engages in repeated violations of a provider's Program Rules; and
>
> (3) In the case of a termination pursuant to paragraph (2)(F) or (G) of this subsection, the provider has made reasonable efforts to help the client overcome obstacles to obtaining permanent housing.

*Id.* § 4-754.36(a)(2)-(3).

their . . . termination . . . from services at least 15 days before the effective date of the . . . termination.").  By contrast, under D.C. Code § 4-754.38(a),

> Whenever a client presents an imminent threat to the health or safety of the client or any other person on a provider's premises, the provider, in light of the severity of the act or acts leading to the imminent threat, may transfer, suspend, or terminate the client within 24 hours of the imminent threat, without providing prior written notice of the transfer, suspension, or termination as required by § 4-754.33(c).

The HSRA defines an "imminent threat to the health or safety" as "an act or credible threat of violence."  *Id.* § 4-751.01(24).

Given that providers must consider "the severity of the act or acts leading to the imminent threat" before issuing an emergency termination, *id.* § 4-754.38(a), it follows that any one "act or credible threat of violence," *id.* § 4-751.01(24), toward another person does not necessarily warrant emergency termination.  This understanding is reinforced by D.C. Code § 4-754.36, which identifies both "[a]ssault[] or batter[y] [of] any person on the provider's premises," and "[e]ndanger[ing] the . . . safety of others on the provider's premises" as bases for *non*-emergency termination.  *Id.* § 4-754.36(a)(2)(C)-(D).  These provisions would be pointless if every "act or credible threat of violence," regardless of severity, triggered emergency termination.  *See D.C. Dep't of Consumer & Regul. Affs. v. A & A Rest. Grp.*, 232 A.3d 149, 154 (D.C. 2020) ("A statute should not be construed

in such a way as to render certain provisions superfluous or insignificant." (quoting *Tuten v. United States*, 440 A.2d 1008, 1010 (D.C. 1982))). And consideration of "the severity of the act or acts leading to the imminent threat," D.C. Code § 4-754.38(a), necessarily includes a consideration of context that may mitigate, if not justify, the "act or credible threat of violence," *id.* § 4-751.01(24); *cf. In re S.W.*, 45 A.3d 151, 155 (D.C. 2012) (explaining that, in analyzing alleged verbal criminal threats, "our cases have stressed that the context in which words are spoken is critical"). An individual who, for example, commits a violent act in self-defense, or in defense of another, may technically commit an "act or credible threat of violence," *id.* § 4-751.01(24), but, given the mitigating context, it would make little sense to rely on such an act as a basis for emergency termination.

The ALJ in this case determined that Mr. Byrd "unquestionably" committed "a violent act on shelter grounds" but observed that, under the statute, "the severity of the act . . . must be considered." The ALJ did note that OAH "has ruled on similar cases and found that a single violent act, such as an intentional elbowing of another person while in the midst of heated argument, would not alone rise to the level of severity that would merit an emergency termination." But he seemingly made this observation to explain (correctly, as we indicated above) that one act or credible threat of violence is not a per se basis for emergency termination of services.

Contrary to Catholic Charities' argument, the ALJ did not focus his analysis on a single act of violence taken out of context. Rather, the ALJ identified *two* acts of violence that potentially could have justified emergency termination under the HSRA: Mr. Byrd's shove of Major Flippen and his struggle with the officers after being restrained. The ALJ then considered whether, under the circumstances, these violent acts were severe enough to warrant an emergency termination. Specifically, the ALJ deemed relevant the fact that "a little over a week before the incident, [Mr. Byrd had been] unlawfully removed from [the shelter] without proper notice" and that, on the day of the incident, security officers "accosted" him, told him incorrectly that he was not allowed to be at the shelter, put their hands on his bag and his person, and attempted to "drag" him from the cafeteria. The ALJ expressly found that Mr. Byrd only pushed Major Flippen "after suffering multiple indignities" and only resisted seizure in response to "being surrounded and manhandled by upwards of eight" security staff. This is precisely the sort of contextual analysis called for by D.C. Code § 4-754.38(a), and thus we reject Catholic Charities' argument that the ALJ took an overly "restricted," acontextual view of the statute's severity requirement.

We also reject Catholic Charities' argument that, when examined in context, Mr. Byrd's conduct was so severe that it required termination as a matter of law. To fill in the evidentiary picture, Catholic Charities attempts to rely on hearsay reports

from two prior termination notices issued against Mr. Byrd, neither of which were ever validated in any administrative review proceeding. Certainly these prior incidents could not themselves serve as the basis for an emergency termination, which must take place "within 24 hours of the imminent threat," D.C. Code § 4-754.38(a), and we are not persuaded that the events described in these reports, even if credited, would materially alter the picture of Mr. Byrd's conduct in the cafeteria on March 22.

First, Catholic Charities calls attention to the October 7, 2023, notice of termination in which Mr. Byrd was accused of "intentionally br[eaking] the plexiglass located at the B-wing security station"[10] and violating program rules.[11] These allegations were never adjudicated or otherwise validated. When Mr. Byrd requested a fair hearing to challenge the termination effort based on this notice, Catholic Charities failed to defend it, declining to file a status report ordered by the ALJ; thus, the ALJ reversed the notice. Even if the ALJ had credited this hearsay report, such damage to property would not constitute an act or credible threat of

---

[10] The incident report listed Natasha Charles as the "[p]erson reporting" the incident; it also listed two security officers as witnesses. Catholic Charities did not attempt to call any of these three individuals as witnesses at the evidentiary hearing.

[11] The October 2023 notice was not placed into evidence at the hearing. *See supra* note 3; *infra* Part II.B. Nevertheless, this notice was included in Catholic Charities' appendix on appeal without objection from Mr. Byrd.

violence against "the client [Mr. Byrd] or any other person" as required by D.C. Code § 4-754.38(a), nor would this incident six months earlier shed much light on Mr. Byrd's conduct on the day of March 22.

Catholic Charities next highlights the March 22, 2024,[12] non-emergency notice, which contained a vague allegation that Mr. Byrd "g[ot] physical" when Catholic Charities tried on March 14 to remove him from the shelter without notice because he had not complied with program rules regarding meeting with his case manager and verifying his employment. Given that this termination led to the ALJ's order that Mr. Byrd be readmitted because the shelter had failed to demonstrate proper service, this incident arguably reinforces the narrative that Catholic Charities had repeatedly acted contrary to the requirements of the HSRA. *See* D.C. Code § 4-754.33(c) (requiring at least fifteen days' notice before a client may be terminated on a non-emergency basis). It comes nowhere near establishing that Mr. Byrd was correctly subjected to emergency termination of shelter services on March 22.

---

[12] In its brief, Catholic Charities describes a notice from March 14, 2024. Though we understand Mr. Byrd to have been (unlawfully) removed from the shelter on March 14, the only notice of termination in the record before us that references the March 14 incident is dated March 22, 2024. There are multiple incident reports describing the events of March 14, though it is not clear from the record whether all of these reports were attached to the March 22 notice, and Catholic Charities did not ask its sole witness, Ms. Carpenter, about these documents. *See supra* note 3.

Catholic Charities alternatively asserts that the events of March 22 alone demonstrate that the ALJ erred or abused his discretion in rejecting the shelter's emergency termination notice. We are unpersuaded. To begin with, we disagree with Catholic Charities' assertion that Mr. Byrd's "flagrant" rule violations help prove the severity of Mr. Byrd's actions that day because we conclude that Catholic Charities failed to present evidence that he violated the WorkBed Temporary Shelter Program rules.

Catholic Charities asserts that Mr. Byrd violated program rules when he "bypassed Ms. Carpenter and security" upon entering the shelter. But Catholic Charities provided no evidence that Mr. Byrd bypassed security; Ms. Carpenter, who is not a security officer, simply testified that Mr. Byrd failed to stop to talk to her at the front desk.

Catholic Charities also asserts that Mr. Byrd's "refus[al] . . . to check-in with facility staff" was a rule violation. We presume, in the absence of a citation to the rules, that Catholic Charities is referring to Rule F.1(b), which states, "[y]ou must Check In with Community Connections staff Every Day," and instructs that "Check In will be received at the front desk of the B/C Wing between 9 AM and 5 PM and with the Community Connections Housing Focused Case Management and Intake

Staff between 5 PM and 10 PM."[13] The rule explains that the "purpose" of the check-in requirement is to "preserv[e] your bed in the 801 East WorkBed Temporary Shelter Program." Mr. Byrd testified that he entered the shelter at around 6:30 p.m. Thus under the rules he was supposed to check in (at some point before 10 PM[14]) with the Community Connections Housing Focused Case Management and Intake Staff to make sure they had a bed for him. There is no evidence that he did not do so. Ms. Carpenter, as far as we are aware from the record before us, was not a member of the Community Connections Housing Focused Case Management and Intake Staff; although she never provided her exact title beyond "program supervisor," she testified that she worked for Catholic Charities.

Catholic Charities lastly asserts that a failure to "acknowledge violations and warnings by program staff"—referring, presumably, to Mr. Byrd's alleged failure to accept service of the termination notice—is its own rule violation. Again, Catholic Charities provides no citation to the rules, and we see no such provision therein. Furthermore, we note that Ms. Carpenter's testimony about the events of March 22

---

[13] The rules explain that "[m]ultiple organizations will be operating out of the 801 East WorkBed Temporary Shelter Program," including Community Connections and Catholic Charities.

[14] Given that the purpose is to ensure the availability of a bed, it is not obvious that the check-in must be immediately upon entry, or whether it could occur later, for example, after a shelter client obtains a meal.

focused only on her efforts to serve Mr. Byrd with the termination notice; she never testified that Mr. Byrd's failure to stop to take the notice of termination from her was a violation of a rule to "acknowledge violations and warnings."[15]

But even if Mr. Byrd *did* violate program rules that day, we fail to see the relevance; "[k]nowingly engag[ing] in repeated violations of a provider's Program Rules" is only a basis for termination on a *non*-emergency basis. D.C. Code § 4-754.36(a)(2)(G). Further, Catholic Charities largely ignores the fact that Mr. Byrd had just returned to the shelter after its prior attempt to terminate him on a non-emergency basis without proper notice, and it entirely disregards the fact that, even if Ms. Carpenter or the security officers *had* served Mr. Byrd with the new notice of non-emergency termination, Mr. Byrd would still have had the right to remain in the shelter until April 6. In other words, at the time of the cafeteria incident, Mr. Byrd was indisputably within his rights to be there. Nevertheless, as the ALJ found, Mr. Byrd was repeatedly told that he was not allowed to be in the building, and, over the course of several minutes, he was surrounded and repeatedly (and sometimes physically) provoked by as many as eight security officers.

---

[15] We disagree that Mr. Byrd's testimony that Ms. Carpenter was "nobody to me" was an admission that he had violated program rules, as opposed to an assertion that he had no obligation to stop to speak to Ms. Carpenter, and we note that he was not cross-examined on this point.

Contrary to the ALJ's factual findings, Catholic Charities asserts that (1) security "officers attempted to peacefully remove [Mr. Byrd] from the cafeteria so that the incident [i.e., his failure to stop to speak to Ms. Carpenter] could be properly addressed"; (2) the officers did "nothing but request[] for him to follow"; (3) at which point Mr. Byrd "assaulted the officers and other shelter staff" and then "resist[ed] arrest." We, however, "defer to OAH findings of fact so long as they are supported by substantial evidence." *Rodriguez v. Filene's Basement Inc.*, 905 A.2d 177, 181 (D.C. 2006). The ALJ, in direct contradiction to Catholic Charities' assertions, found that the security guards escalated the situation by "accost[ing]" Mr. Byrd, "st[anding] over him in an intimidating manner," "surrounding" him, putting their hands on his bag and body, and attempting to "drag[]" him from the cafeteria. These findings are amply supported not only by Mr. Byrd's testimony but also by the video footage, which shows the security officers throwing away Mr. Byrd's food, taking his chair, and reaching for his possessions and his person—all before Mr. Byrd pushed Major Flippen away.[16]

---

[16] Apparently relying on Ms. Carpenter's testimony, Catholic Charities also asserts that Mr. Byrd threatened to kill officers and staff members. But the ALJ expressly "d[id] not credit Ms. Carpenter's testimony that [Mr. Byrd] threatened to 'kill' staff" because this testimony was "uncorroborated" and because the ALJ seemingly determined that Ms. Carpenter was an unreliable witness. *See infra* Part II.C. Catholic Charities fails to acknowledge the ALJ's assessment of Ms. Carpenter's credibility, much less provide us with a reason to disregard it.

Lastly, we note that this whole incident was supposedly sparked by Ms. Carpenter's unsuccessful attempt to serve Mr. Byrd with the non-emergency termination notice at the front desk: she testified that she sent security to the cafeteria to "bring Mr. Byrd back up" to her, apparently so that she could try again to serve him. Yet there is no evidence in the record that Ms. Carpenter or the security officers made another effort to give Mr. Byrd this notice. Rather, all the evidence indicates that Catholic Charities was once again attempting to remove Mr. Byrd from its shelter without the requisite notice. It seems clearly contrary to the statutory scheme of the HSRA and its regulations—which encourage providers to explore alternatives to emergency termination[17]—to allow a service provider who has failed to terminate a client under the non-emergency procedures to escalate an interaction with the client in order to provoke a response that justifies termination on an emergency basis instead.

---

Catholic Charities also asserts that the "video evidence demonstrates that [Mr. Byrd] attempted to incite other residents against the officers, which was an effort to disrupt shelter operations," but as explained above, the video has no audio, *see supra* note 6, and it does not otherwise clearly show that Mr. Byrd was trying to "incite other residents."

[17] *See* 29 D.C.M.R. § 2524.3 ("encourag[ing]" providers "to try to diffuse the situation by such means as separation, mediation, or non-emergency transfer, suspension, or termination, if feasible, as an alternative to or prior to taking an emergency action").

For all of these reasons, we reject Catholic Charities' challenge to the ALJ's determination that Catholic Charities had failed to prove that Mr. Byrd's actions were severe enough to warrant emergency termination under D.C. Code § 4-754.38(a).

## B. Prior Incidents

Catholic Charities next argues that the ALJ "erred by not admitting into evidence [Mr. Byrd's] past misconduct, which provided important context to consider regarding the emergency termination." Because Catholic Charities failed to preserve this argument, we decline to address it.

In its brief to this court, Catholic Charities does not describe with any specificity the evidence it was prevented from introducing at the evidentiary hearing. It states only that the ALJ "restricted [Catholic Charities'] ability to present evidence demonstrating that [Mr. Byrd] had a history of misconduct, including other violent acts" and "refused to allow the client's history of noncompliance with the Program Rules and aggression with staff to play a factor in reviewing whether there was an immediate threat." Catholic Charities points us to only one place in the record where the ALJ actually overruled an objection by its counsel: during Mr. Byrd's cross-examination of Ms. Carpenter, Catholic Charities objected that Mr. Byrd should not be permitted to question her about alleged prior mistreatment of him by Catholic

Charities staff, because the ALJ had discouraged Catholic Charities from presenting evidence of Mr. Byrd's "prior malfeasance" and had instead advised counsel to "stick to the day" of the cafeteria incident.

We thus consider the only point in the hearing where Catholic Charities sought to present evidence about Mr. Byrd's conduct prior to the March 22 incident. During Ms. Carpenter's testimony, counsel began to ask her about the October 7, 2023, termination notice. When the court asked why this was relevant, counsel responded that it would "demonstrate that [Mr. Byrd] has a history of non-compliance with program rules." The court then stated that it "thought that this was about . . . an emergency termination" and asked if "the March 2024" notice was "the Emergency Termination Notice." Counsel explained that there were two notices from March 2024—the non-emergency notice and the emergency notice—but offered, without further prompting from the ALJ, to "jump right to" the latter if the ALJ preferred. The ALJ accepted that offer, explaining that he did not "want to get into the program rules because this is really going to come down to the emergency termination," and counsel responded "[o]kay." Catholic Charities subsequently introduced, through Ms. Carpenter, the March 22, non-emergency termination notice. When counsel explained, "I do need to refer to that because that is part of the relevance," the ALJ responded, "[y]eah, I understand."

"Procedural objections to the action of an administrative agency or trial court must be timely made to give the tribunal an opportunity to correct the error, if error there be; such contentions cannot first be made on appeal." *Fair Care Found., A.G. v. D.C. Dep't of Ins. & Sec. Regul.*, 716 A.2d 987, 993 (D.C. 1998) (quoting *Bhd. of R.R. Trainmen v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 380 F.2d 605, 608-09 (D.C. Cir. 1967)). "Absent extraordinary circumstances . . . we refuse to address requests for relief not timely presented to the administrative agency." *Black v. D.C. Dep't of Hum. Servs.*, 188 A.3d 840, 847 (D.C. 2018). Counsel for Catholic Charities never so much as suggested before OAH that it intended to present evidence of Mr. Byrd's prior "aggression" or other "violent acts." Counsel stated only that it wanted to introduce the October 2023 notice to demonstrate Mr. Byrd's "history of non-compliance with program rules" (by itself a basis for a *non*-emergency termination, not an emergency one, *see* D.C. Code § 4-754.36(a)(2)(G)), and made no argument in support of this line of questioning when the ALJ inquired about its relevance; to the contrary, counsel offered to "jump right to" a discussion of the March 22 emergency notice *before* the ALJ stated that he "d[id not] want to get into the program rules" because he did not understand them to be relevant to the emergency termination of services in this case. As for the March 22 non-emergency termination, which *was* admitted into evidence, counsel made no effort to question Ms. Carpenter about the basis for that notice or to elicit testimony

regarding any history of violence or aggression related to that notice.[18]

Based on this record, we conclude that any challenge to the exclusion of evidence regarding Mr. Byrd's prior misconduct is forfeited.

### C. Ms. Carpenter's Testimony

Catholic Charities argues that "the ALJ erred in discrediting Ms. Carpenter's testimony at the hearing." Catholic Charities specifically takes issue with the ALJ's decision to "discredit[] Ms. Carpenter's testimony that [Mr. Byrd] threatened to kill shelter staff," since "had Ms. Carpenter been found credible regarding the threats, he would have likely ruled in favor of" Catholic Charities. "Credibility determinations are within the discretion of the ALJ, and typically are 'entitled to great weight' due to the ALJ's unique ability to hear and observe witnesses first hand." *Rocha-Guzmán v. D.C. Dep't of Emp. Servs.*, 170 A.3d 170, 175 (D.C. 2017) (quoting *Washington Metro. Area Transit Auth. v. D.C. Dep't of Emp. Servs.*, 683 A.2d 470, 477 (D.C. 1996)). "[W]e review such determinations to see whether they are supported by substantial evidence on consideration of the entire record." *Id.* at 177. From our review of the record, we are persuaded that the ALJ's decision to

---

[18] Nor does it appear that counsel could have done so, given that Ms. Carpenter was not a witness to the events on March 14 that led to the initial March 22 notice. *See supra* note 3.

"give Ms. Carpenter's testimony reduced weight" was supported by substantial evidence.

To begin with, Ms. Carpenter was not present for the first few minutes of the cafeteria incident; she did not arrive until after the situation had already escalated dramatically and after Mr. Byrd had pushed Major Flippen.[19]  Catholic Charities nonetheless suggests that Ms. Carpenter's account of the events should be credited because "she later reviewed the video footage to write the incident report."  But to the extent that Ms. Carpenter's testimony was based only on her review of the video footage, there is no reason her testimony should have been credited over what the ALJ himself observed in the video.  *See Callaham v. United States*, 268 A.3d 833, 848 (D.C. 2022) (rejecting the argument that a witness "obtained personal knowledge" of events "solely by watching recorded surveillance footage").

This is all the more true because several of Ms. Carpenter's statements were directly contradicted by the video.  She stated, for example, that Mr. Byrd was

---

[19] Catholic Charities suggests that the ALJ's finding that Ms. Carpenter did not arrive on the scene until Mr. Byrd "was under the control of several security officers" was "demonstrably false" because, at the time of her arrival in the cafeteria, Mr. Byrd was "free from any restraint."  It is not clear to us that the ALJ meant that Mr. Byrd was physically restrained at that time—we agree that he was not—or simply that he was sufficiently surrounded by security guards that he was "under [their] control."  Regardless, it is indisputably true that Ms. Carpenter did not arrive until several minutes into the interaction, by which time the situation had already reached a boiling point.

"shoving all officers on duty," but the video evidence does not bear that out. Mr. Byrd did not push away anyone other than Major Flippen; the only other physical confrontation came after several officers put their hands on Mr. Byrd and attempted to forcefully remove him from the cafeteria, at which time he began pulling against their restraints. Ms. Carpenter also testified that Mr. Byrd "was tearing the cafeteria up" and "flipping the chairs upside down." But the video does not show Mr. Byrd causing any physical damage to the cafeteria, or flipping any chairs upside down; in fact, as the ALJ noted in its findings of fact, it was Major Flippen who took the chair on which Mr. Byrd had been sitting and put it on a table.[20]

In light of these inconsistencies, Ms. Carpenter's lack of personal knowledge of much of what occurred, and the great weight we give to an ALJ's credibility determinations, we see no reason to question the ALJ's decision to accord reduced weight to Ms. Carpenter's testimony.

---

[20] Catholic Charities asserts that "the proposition that [Mr. Byrd] never threw any chair is demonstrably false. In the provided video footage, [Mr. Byrd] clearly knocks over a chair to place it between himself and the officers." Having reviewed the video footage ourselves, we cannot agree that the ALJ's finding is "demonstrably false." The footage shows Major Flippen pushing a chair away from Mr. Byrd and then picking it up and placing it on the table. At no point does the video footage clearly show Mr. Byrd knocking over the chair.

\*            \*            \*

For the foregoing reasons, the order of the OAH ALJ is affirmed.

*So ordered.*